**In re 865 CENTENNIAL AVENUE AS-
SOCIATES LIMITED PARTNER-
SHIP, Debtor.**

**Bankruptcy No. 95–36264.**

United States Bankruptcy Court,
D. New Jersey.

Oct. 1, 1996.

Ravin, Greenberg & Marks, Morris Bauer, Roseland, NJ, for debtor.

Shanley & Fisher, A. Dennis Terrell, Lawrence E. Behning, Morristown, NJ, for creditor Barclays Bank P.L.C.

Cooper, Rose & English, John J. Delaney, Jr., Summit, NJ, for Mazda Motor of America.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### *PROCEDURAL BACKGROUND*

This matter comes before the court on a motion brought by creditor, Barclays Bank PLC, New York branch ("Barclays") to dismiss the chapter 11 bankruptcy proceeding pursuant to 11 U.S.C. § 1112(b). A plenary hearing was held March 1 and March 19, 1996. Barclays contends that the case should be dismissed because there is no equity in debtor's sole asset and no possibility of reorganization of this single asset real estate case. Debtor disputes Barclays' appraisal and counters that there is equity in the property and that reorganization is in prospect within a reasonable time. At the plenary hearing numerous witnesses testified for both sides and evidence was entered into the record. The parties also submitted post-hearing briefs on April 22, 1996.

This court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. §§ 157(b)(2)(A), (B) and (O).

### *FACTUAL FINDINGS*

#### Parties and Description of the Property

Debtor, 865 Centennial Avenue Associates, L.P., is a New Jersey limited partnership ("debtor"). The general partner of debtor is United States Land Resources, L.P. ("USLR"), whose principal is Mr. Lawrence Berger. (Barclays' Reply Brief filed 11/3/95, p. 2) (Transcript of Lawrence Berger 2004 Exam p. 5). Mr. Berger and his various

partners, through USLR and at least six distinct partnerships, developed an extensive amount of real estate in the State of New Jersey in the mid to late 1980's. This case involves the properties of one of those partnerships, debtor, 865 Centennial Avenue Associates, L.P.

Debtor's sole asset is property located at 865 Centennial Avenue, Piscataway, New Jersey (the "property"). The business of the debtor is the ownership, management and maintenance of the property. Debtor's affiliated entity, 865 Associates, L.P., purchased the property on December 19, 1985 for $3,250,000 from Carter–Wallace, Inc. The affiliate later transferred the property to debtor for $1.00. (Appraisal of Joseph Mazotas, Inc. dated December 6, 1988 p. 12).

When purchased, the property contained approximately ten acres of land bordering Centennial Avenue and the south side of Interstate Highway Route 287. (Appraisal of John O. Lasser Associates, Inc., dated February 23, 1996 p. 15) (hereinafter "Lasser App."). In June 1995, the State of New Jersey Commissioner of Transportation commenced a condemnation action in which it took 2.84 acres of land, leaving 7.162 acres remaining in an irregular configuration. (*Id.* at 10; *see also* Certification of Lawrence Berger in Opposition filed 4/1/96 Exh. H) (hereinafter "Berger Cert."). The State deposited $809,700 into an escrow account as compensation for the taking and began construction of a two-way access ramp to Route 287. (Berger Cert. Exh. H). The highway ramps are located fifteen feet from the warehouse and twenty-five feet from the office space of the property. During rush hours, there is potential for stacking of traffic directly in front of the driveway to the property. (Lasser App. p. 25).

Prior to constructing any building on the premises, debtor entered into a ten year lease dated August 15, 1988, with Mazda Motor of America ("Mazda"). The lease term commenced December 1988 and was to end on October 31, 1998. The rent was $462,500 a year for the first five years ($9.25 per square foot) and $550,000 each year for the subsequent five years ($11.00 per square foot). Mazda was responsible for the taxes. The lease had a provision which permitted Mazda to terminate the lease in the event of a condemnation by eminent domain of twenty percent or more of the property (Lasser App. p. 14). When the State commenced its condemnation proceeding, Mazda elected to terminate the lease and vacated the property several months ago.[1]

Debtor commenced construction of the building on the premises in 1988 pursuant to the terms of the Mazda lease and constructed a 50,000 square foot one and two story, masonry and steel warehouse and office facility. (Lasser App. p. 14). The building, which was constructed to Mazda's specifications, contains approximately thirty-six percent office space. The warehouse portion of the premises contains a 19,160 square foot section with 26 foot ceilings and up-graded lighting. (Transcript of Hearing, March 1, 1996 Testimony of Paul Gavin p. 108) (hereinafter "Tr."). There is an additional area of the warehouse which contains 7,924 square feet which was outfitted as an area in which to conduct Mazda training classes. That section contains lowered ceilings, ceramic flooring, full heating, ventilation and air-conditioning as well as highly up-graded lighting. Above the lowered ceiling is an unfinished mezzanine of approximately 3,226 square feet. *Id.* at 107. The remaining 22,916 square feet of space (or approximately thirty-six percent of the total square footage) is traditional office space. *Id.*

### Financing and State Court Litigation/Bankruptcy Proceedings

In order to finance this project, debtor entered into a credit agreement in the amount of $4,363,528 with Barclays on August 21, 1989 ("letter of credit").[2] The letter of credit guaranteed that debtor would pay

---

**1.** This statement is not intended to take any position as to the meaning or extent of the eminent domain provision of the lease, nor does this opinion rule on the propriety of Mazda's termination of the lease. Those issues are the subject of a pending adversary proceeding before this court.

**2.** Barclays provided financing for all six of the Lawrence Berger/USLR projects.

New Jersey Economic Development Authority ("NJEDA") bonds in the principal amount of $4,250,000. (Berger Cert. p. 6). To secure the obligations under the letter of credit, debtor granted an assignment of rents and leases in favor of Barclays. *Id.* The bonds were scheduled to mature, and the letter of credit (which backed the bonds) expired pursuant to its own terms on August 10, 1994. (*Id.;* Barclays Post–Trial Brief filed 4/22/96 p. 15).

The letter of credit provided that in the event of default by the debtor, Barclays had the option to purchase the bonds; and the total amount drawn under the letter of credit would become immediately due and payable by debtor. (Barclays' Post-trial Brief p. 16).

Debtor contends that in June 1993, Barclays and representatives of the six borrowers commenced negotiations to resolve issues relating to default and extension of the loans and reached a settlement. Barclays, however, took the opposite position and declared all six loans in default on February 17, 1994. (Berger Cert. p. 6–7) Upon debtor's default on the bonds, Barclays "had an obligation to exercise its business judgment and reasonably protect its own interests" and therefore chose to buy back the bonds. (Letter Opinion of Hon. Norris Harding, J.S.C. dated 9/15/95, p. 4).

Barclays commenced a foreclosure action against debtor in Superior Court of New Jersey, Chancery Division, Middlesex County on March 11, 1994, Docket No. F–3378–94. (Berger Cert. p. 8). The matter was assigned to the Honorable Norris Harding, J.S.C. who has presided over the foreclosure proceeding ever since. The matter was vigorously litigated and every issue appears to have been hotly contested throughout the foreclosure proceeding.

On May 14, 1994, Judge Harding denied a motion to appoint a rent receiver. (Berger Cert. p. 9). Thereafter, in August 1994, debtor contends that Barclays and the six borrowers reached yet another global settlement. However, the matter proceeded to trial commencing in October 1994. In November 1994 another motion to appoint a rent receiver was denied. *Id.* at 10.

Debtor's foreclosure action was then consolidated with the foreclosure proceeding of one of the related entities, Raritan Building Associates Limited Partnership, in December 1994. *Id.* The trial on both of those cases lasted approximately ten weeks, during which testimony was given by representatives of all parties, and evidence was offered into the record as to all issues including the amount due on the loans. In addition, argument was heard on debtor's defenses, including settlement, buy-back of NJEDA bonds, interest rates, and off-sets. (Harding Opinion; *see also* Transcript of State Court Trial dated 5/14/94). On July 21, 1995 Judge Harding issued a twenty-five page written opinion. Judge Harding held *inter alia* that foreclosure judgment should be entered in favor of Barclays.

Shortly thereafter, the parties disputed the form of the final judgment of foreclosure, including amounts due and the subsidiary issues of off-sets, buy-back of NJEDA bonds, and interest rates. The state court received nine letters between August 9 and September 5, 1995 submitting the positions of the parties as to the amount due for the foreclosure judgment. The court made inquiries as to certain issues and Barclays submitted an additional two letters to Judge Harding in response to that inquiry on September 11 and 14, 1995. (Harding Opinion pp. 1–2).

Debtor filed its bankruptcy petition on September 7, 1995. On September 19, 1995 Judge Harding issued an eight page letter opinion acknowledging that the matter was stayed by the bankruptcy filing and refusing to enter the foreclosure judgment until an order was issued from this court lifting the stay. The opinion continued that "since the issues regarding both cases have long since been decided on July 21, awaiting only the entry of Final Judgments, I do not perceive that I am prevented from expressing my views concerning such Final Judgments even though only one can now be entered." (referring to the Raritan property which had not yet filed its petition in bankruptcy) (Harding Opinion at 2). Judge Harding thereafter made factual findings as to debtor's arguments on amount due concerning off-sets, interest rates and NJEDA buy-back of the

bonds.[3] Final judgment of foreclosure was entered in the Raritan matter on September 19, 1995. That judgment is presently on appeal. (Berger Cert. p. 11).

This court granted limited relief from the automatic stay on December 15, 1995 allowing the entry of the foreclosure judgment against the property. On January 16, 1996, Judge Harding entered the form of judgment submitted by Barclays with significant handwritten changes apparently made by Judge Harding himself. (Final J. of Foreclosure dated 1/16/96) ("final judgment"). Although debtor claims that Judge Harding based the amount due only on the certification of Salvatore Esposito dated August 8, 1995, a fair reading of the handwritten language carefully inserted by Judge Harding indicates that he considered the many objections of debtor in its January 3, 1996 letter and was satisfied by Barclays' explanations of those issues in a January 10, 1996 certification of Mr. Esposito. *Id.* The amount due Barclays as set forth in the final judgment is $4,491,563.83. *Id.* The final judgment was appealed to the New Jersey Appellate Division on February 14, 1996. (Berger Cert. Exh. H). No stay of Judge Harding's judgment was entered.

The parties then proceeded in this court with a plenary hearing on the motion to dismiss the pending case. At issue was whether there was equity in the property. Thus, this court heard testimony on March 1 and March 19, 1996 of witnesses for both Barclays and debtor with respect to the valuation of the property.

### Valuation of the Property

John O. Lasser, a highly respected real estate appraiser in the State of New Jersey, who was qualified as an expert commercial appraiser with an MAI (a Member of the Appraisal Institute), testified on behalf of Barclays. (Tr. p. 9). Mr. Lasser was the only certified real estate appraiser to testify as to the value of the property.[4] In addition to Mr. Lasser, Mr. Paul Starke, a broker in commercial real estate and Mr. George Jacobs, a commercial real estate mortgage broker, testified on behalf of Barclays. Messrs. Paul Gavin, Frank Caccavo and Edward Dudinski, all commercial real estate brokers, testified on behalf of debtor as to valuation of the property. (Tr. p. 101; March 19, 1996 Tr. pp. 8 and 31). Only Barclays offered into evidence a current appraisal dated February 23, 1996. (Evidence Exh. B–2)[5]. Debtor relied on an appraisal dated December 6, 1988, prepared for Barclays by Joseph Mazotas, Inc., which this court finds obsolete as it is almost eight years old and was prepared prior to construction of any building on the property. (Berger Cert. Exh. I)

In determining a fair market value for the property, Mr. Lasser used both the sales comparison approach and the income capitalization approach to real estate valuation. This court will first address the sales comparison approach.

### Sales Comparison Approach

The sales comparison approach to valuation is a method of estimating market value by comparing the subject property to similar properties that have been sold recently. Such method uses certain adjustments up or down to the price per square foot to account for differences in the properties. (Lasser App. p. 16). After making the appropriate adjustments for such conditions as location, size, physical condition, and damages, and after adjusting the comparable prices for time and inflation, a final adjusted price per square foot is calculated. *Id.* (citing THE

---

3. Because this court finds *infra* that the rulings of Judge Harding have preclusive effect, the findings of Judge Harding in the state court proceedings are of particular relevance.

4. Debtor repeatedly disputes Mr. Lasser's qualifications to testify as to market conditions because, as a real estate appraiser, he is not marketing properties on a day-to-day basis as is the debtor's expert real estate brokers. This court finds that a real estate appraiser is perhaps the most qualified professional to conduct an appraisal of real property. It is the appraiser's stock in trade to know current market conditions. Moreover, this court was most impressed with the testimony of Mr. Lasser which was tempered, professional, and persuasive.

5. Mr. Lasser had also prepared an appraisal of the property on April 15, 1994, prior to the condemnation and the notice of intention to terminate the lease by Mazda; the appraisal valued the property at $3,325,000.

APPRAISAL OF REAL ESTATE, 10th ed. Chicago: Appraisal Institute, 1992).

The appraisal used five comparables. Mr. Lasser allowed a fifteen percent upward adjustment for physical condition due to the property's up-graded characteristics including age, level of deterioration, construction quality and interior finishes. (Lasser App. p. 18–19). In all five comparables, however, Mr. Lasser calculated a ten percent downward adjustment due to damage from the condemnation by the State of New Jersey Department of Transportation. Mr. Lasser did not adjust for size because the comparables all ranged from 37,500 to 87,287 square feet in size which is not considered great enough to merit an adjustment. (*Id.*) Mr. Lasser also did not adjust for location because all of the comparables were located within the same "287 Corridor" market area. (Tr. p. 28). Mr. Lasser also did not adjust for market conditions because during the 1993 to 1995 period (period of the sales to date) the price and value trends of commercial real estate in the subject market area remained stable. *Id.* Based upon the combined weight of the comparables listed below, Mr. Lasser arrived at a figure of $35.00 per square feet and multiplied it by 50,000 square feet for a valuation of $1,750,000. *Id.*

Debtor objected to the downward adjustment for the condemnation, arguing that Mr. Lasser should have upwardly adjusted for highway access. (Debtor's Brief p. 31–32). This court finds that the downward adjustment was appropriate as a two-way highway ramp is now located only fifteen feet from the warehouse and twenty-five feet from the office building. In addition, there is potential for stacking of traffic directly in front of the driveway to the building. This problem raises a host of problems such as air pollution, noise pollution, visual unattractiveness and safety concerns as well as the possible inconvenience due to potential traffic jams blocking access to the driveway. Most importantly, the condemnation carved the property into an irregular configuration and left the vacant land unsuitable as a building site.

Debtor also argued that the market for industrial real estate was not stable but rather has heated up. Thus debtor contends that Mr. Lasser's use of past sales/leases are not predictive of future purchases/rentals. This court is impressed with Mr. Lasser's testimony that the market has not recently improved but has remained stable. Debtor asserts that "prices have been going up" and that available space is decreasing. (Debtor's Brief pp. 27–28). The evidence presented to the court by debtor's expert listing comparable transactions, indicates that the highest rents were generated in 1994 while the lowest rentals occurred in 1996 with a steady decline in the interim. (Evidence Exh. D–4). The court also notes that debtor's own witness testified that there are presently over 11–13 million square feet of commercial space available in Middlesex County, the majority of which is warehouse/office space and 1.6 million square feet of industrial space available in Piscataway alone. In addition, Murray Construction Corporation, which owns one of the nicest corporate parks in Piscataway has over 250,000 square feet available. (Tr. 135).

Debtor did not submit any of its own sales comparables but disputed each of Mr. Lasser's comparables. Each of Mr. Lasser's comparables and debtor's objections thereto are addressed below.

### Sales Comparables

The first comparable. sale is 100 Springfield Avenue, Piscataway, NJ which sold on February 10, 1993 for $2,700,000. The price per square foot of that facility was $31.66 for 85,287 square feet. The adjusted price per square foot was $33.24 after taking into consideration the adjustments. (a net positive adjustment of five percent) (Lasser App. p. 18).

Mr. Gavin, who testified on behalf of debtor contended that this comparable was distinguishable from 865 Centennial Avenue because the comparable is a simple warehouse/office building and not a "high-tech" or "flex-space" facility. Debtor and Mr. Gavin stress that comparing a typical office/warehouse to debtor's high-tech facility is the equivalent of comparing a "Chevy to a Cadillac." According to Mr. Gavin, what makes 865 Centennial Avenue a "high-tech" or "flex-space" facility is the thirty-six per-

cent of office space as opposed to the five to ten percent office space which is typical for a warehouse. (Tr. p. 117). Additional "high-tech" features are the 7,924 square feet of space out-fitted to conduct Mazda training classes containing tiling, lowered ceilings and up-graded lighting and HVAC. In addition, 865 Centennial Avenue contains a large amount of land and room for expansion. (*Id.* at 121.)

This court finds that Mr. Lasser's comparable using a warehouse/office facility is appropriate. First, the essence of the high-tech objection is that 865 Centennial Avenue has superior physical conditions to that of the comparable. However, none of debtor's witnesses addressed the fact that Mr. Lasser has already awarded 865 Centennial Avenue a fifteen percent upward adjustment for its physical characteristics which include such interior conditions such as lighting and tiling (the very criteria which make the 865 Centennial Avenue property "high-tech" according to debtor's experts). Thus Mr. Lasser's appraisal takes into account the high-tech features of the property.

In addition, this court accepts Mr. Lasser's testimony that a warehouse/office facility is the proper comparable because the "high-tech" purchaser or lessor is atypical and the "one in a hundred" tenant or purchaser. (Tr. p. 135). The client envisioned by debtor's expert is a start-up company operating on venture capital and anticipating an initial public offering ("IPO"). According to debtor's expert, this client is "going to have a significant capital expenditure into the facility, but the image is very important. Because if they're going out with an IPO, they want to sell some sizzle as well as steak." (Tr. p. 135). This court finds the optimism of debtor's expert speculative. The more specialized the building, the longer it takes to find such a perfect tenant/purchaser fit. As testified by Mr. Lasser, ninety-nine out of one hundred clients are seeking typical warehouse/office space not "high-tech" space as outfitted for Mazda. (Tr. p. 35) Furthermore, Med–Co Containment Services, a high-tech facility in Parsippany, New Jersey stood vacant for over five years. (Tr. p. 139) Debtor, itself, admits that finding a perfect tenant

fit, as envisioned by debtor's expert, is a time consuming process. (Debtor's Brief p. 36 n. 14). Thus even if Mr. Lasser did not make the upward fifteen percent adjustment for physical interior, the comparable to typical warehouse space would be appropriate. That Mr. Lasser did upwardly adjust for the high-tech characteristics, makes his appraisal that much more compelling.

The second comparable sale is 5 Connerty Court, East Brunswick, NJ which sold on April 22, 1993 for $1,708,000. The price per square foot of that facility was $37.45 for 45,610 square feet. The adjusted price per square foot was $39.32 after taking into consideration the adjustments. (a net positive adjustment of five percent) (Lasser App. p. 18).

Debtor's expert objected to the comparable on the basis that it is not a high-tech facility (Tr. 121). As addressed above, however, the use of a warehouse/office facility as a comparable is appropriate.

The third comparable sale is 145 Belmont Drive, Franklin, NJ which sold on June 1, 1993 for $1,500,000. The price per square foot of that facility was $39.68 for 37,800 square feet. The adjusted price per square foot was $41.66 after taking into consideration the adjustments. (a net positive adjustment of five percent) (Lasser App. p. 18).

Debtor's expert also objected to this comparable on the basis that it is not a high-tech facility (Tr. 121). Again the use of a warehouse/office facility as a comparable is proper. Mr. Gavin also objected because that the comparable was as a result of a foreclosure which generally results in a lower price (*Id.*). It is important to note, however, that this property generated the highest price of all of the comparables.

The fourth comparable sale is 701 Hadley Road, South Plainfield, NJ which sold on April 7, 1994 for $1,683,333. The price per square foot of that facility was $32.27 for 52,170 square feet. The adjusted price per square foot was $33.88 after taking into consideration the adjustments. (a net positive adjustment of five percent) (Lasser App. p. 19).

Debtor's expert objected to the comparable on the basis that it is not a high-tech facility (Tr. 121). As addressed above, the use of a warehouse/office facility as a comparable is fitting in this situation as well.

The fifth comparable sale is 301 Helen Street, South Plainfield, NJ which sold on June 20, 1994 for $1,134,417. The price per square foot of that facility was $30.25 for 37,500 square feet. The adjusted price per square foot was $31.76 after taking into consideration the adjustments. (a net positive adjustment of five percent) (Lasser App. p. 19).

Debtor's expert objected to the comparable on the basis that it is not a high-tech facility (Tr. 121). Here as well, the use of a warehouse/office facility as a comparable is correct. Debtor's expert also objected because the facility was an inferior product to that of 865 Centennial Avenue due to its less prestigious location and the reputation of its builder. Mr. Gavin did not specify a dollar amount by which the alleged inferiority would reduce the purchase price. (*Id.*). The court finds this distinction alone to have a *de minimis* effect on valuation and insufficient to invalidate the appraisal.

### Income Capitalization Approach

Mr. Lasser also used the income capitalization approach to value the property. That method consists of techniques and mathematical procedures that an appraiser uses to analyze a property's capacity to generate monetary benefits and to convert those benefits into an indication of present value. (Lasser App. p. 22). Under the income capitalization approach, net income is determined by subtracting estimated expenses (i.e. taxes, insurance, utilities, commissions, management fees) from gross economic income (an estimate of potential rental income less standard allowances for vacancies or rent losses). Net income is then capitalized and rounded up or down. *Id.* (citing THE APPRAISAL OF REAL ESTATE. 10th ed. Chicago: Appraisal Institute, 1992).

Mr. Lasser determined a gross economic income of $261,250;[6] and undisputed expenses of $35,063 for a net income of $226,187. Mr. Lasser calculated an income capitalization rate[7] of 10.6%[8] with which to capitalize the net income. The capitalized net income (rounded) is $2,135,000. Mr. Lasser subtracted from capitalized net income a tenant fit-up cost of $375,000[9] for a valuation of $1,760,000. (Lasser App. p. 28).

Debtor disputes Lasser's estimated rental income of $5.50 per square foot. Debtor claims that a fair market rental should be $7.50 per square foot. (Tr. p. 143; Debtor's Brief in Further Opposition, filed 4/22/96 p. 25) (hereinafter "Debtor's Brief"). This court will thus address the lease comparables that Mr. Lasser used to determine a fair market rental.

### Comparable Leases
#### Lasser's Comparables

As with the comparable sales, Mr. Lasser allowed a 15% upward adjustment for the

---

6. Based upon an estimated rental of $275,000 ($5.50/sq. ft.) less an allowance of $13,750 for vacancies and rent losses.

7. An investor who purchases income producing property is essentially trading a sum of present dollars for the right to receive future dollars. The capitalization rate represents the return an equity investor and lender would expect from their respective investments. The capitalization rate is determined by employing a technique in which cash flow rates attributable to components of a capital investment are weighted and combined to derive a weighted average rate attributable to the total investment. (Lasser App. at 29) (citing THE DICTIONARY OF REAL ESTATE APPRAISAL, 3d ed. Chicago: Appraisal Institute, 1993; and latest release of AMERICAN COUNCIL OF LIFE INSURANCE COMPANIES' INVESTMENT BULLETIN).

8. Debtor disputes the capitalization rate by indicating that Mr. Jacobs' testimony that the property could be financed at a 8.25 to 8.5% interest rate "is at variance with Mr. Lasser's 'overall capitalization rate' of 10.6%." (Debtor's Brief p. 37). The court notes that the capitalization rate and the interest rate are totally different concepts. The interest rate is only one component of the capitalization rate. Moreover, debtor provided no evidence or independent analysis of what the capitalization rate should be.

9. Debtor disputes the $375,000 tenant fit-up costs by suggesting that it is folly to convert a high-tech facility into a plain vanilla warehouse/office facility. (Debtor's Brief p. 41). However, as mentioned *infra* debtor's own expert, Mr. Dudinski, calculated a $255,000 tenant fit-up cost. In addition, as found above, the typical tenant requires typical office/warehouse space.

superior physical condition of the property and a 10% downward adjustment for the condemnation for all of the comparable leases. Mr. Lasser also made the appropriate adjustments for size of the leased premises, depending upon the square footage of the particular facility.

The first comparable lease is 80 Centennial Avenue, Piscataway, NJ which was leased on June 1, 1993 for $6.03 per square foot for a 42,000 square foot space. No adjustment was made for size. The adjusted price per square foot was $6.33 after taking into consideration the adjustments. (a net positive adjustment of five percent) (Lasser App. p. 25).

Debtor's expert objected because this comparable is a simple office building and not a "high-tech" facility (Tr. p. 123). As addressed above, the use of a plain warehouse/office facility is proper.

The second comparable lease is 183 National Road, Edison, NJ which was leased on June 1, 1994 for $5.00 per square foot for an 80,000 square foot space. A downward 5% adjustment was made for size. The price per square foot of that facility was $5.00 per square foot after taking into consideration the adjustments. (a net zero adjustment) (Lasser App. p. 25).

Debtor's expert objected to the comparable on the basis that it is not a high-tech facility (Tr. p. 124), however, as addressed above the use of a warehouse/office facility as a comparable is appropriate. Debtor's expert also objected because the facility was an inferior product to that of 865 Centennial Avenue due to its less prestigious location. Mr. Gavin did not specify a dollar amount by which the alleged inferiority would reduce the purchase price. (*Id.*). Accordingly, the court notes that the comparable is in the same 287 Corridor Market and finds this distinction alone to have a *de minimis* effect on valuation and insufficient to invalidate the appraisal.

The third comparable lease is 60 Ethel Road W., Piscataway, NJ which was leased on August 1, 1994 for $4.25 per square foot for a 16,000 square foot space. An upward 15% adjustment was made for size. The price per square foot of that facility was $5.10 per square foot after taking into consideration the adjustments. (a net positive 20% adjustment) (Lasser App. p. 25). Debtor's expert made no objection to this comparable. (Tr.)

The fourth comparable lease is 85 National Road, Edison, NJ which was leased on October 26, 1994 for $4.70 per square foot for a 24,857 square foot space. A 10% upward adjustment was made for size. The adjusted price per square foot was $5.41 after taking into consideration the adjustments. (a net positive adjustment of fifteen percent) (Lasser App. p. 25).

Debtor's expert objected because the comparable is not a "high-tech" facility (Tr. p. 124). Again, as addressed above, the use of a plain warehouse/office facility is fitting. Debtor's expert also objected because the facility was situated in an inferior location to that of 865 Centennial Avenue. Mr. Gavin did not specify a dollar amount by which the alleged inferiority would reduce the purchase price. (*Id.*). Again, the court finds that this distinction alone has a *de minimis* effect on valuation and is insufficient to invalidate the appraisal.

The fifth comparable lease is 60 Ethel Road, Edison, NJ which was leased on May 1, 1995 for $5.50 per square foot for a 5,500 square foot space. A 20% upward adjustment was made for size. The adjusted price per square foot was $6.88 after taking into consideration the adjustments. (a net positive adjustment of twenty-five percent) (Lasser App. p. 25).

Debtor's expert objected to this comparable on the basis of its size (Tr. p. 125); however, as noted above, Mr. Lasser made a twenty percent upward adjustment for size.

### Other Comparables

Mr. Paul Starke of Madison Partners of New Jersey, Inc., testified on behalf of Barclays that the market rate for rent of the property should be $4.00 to $4.50 per square foot. (Tr. p. 29). Mr. Starke based this opinion in part on the fact that the property taxes on 865 Centennial Avenue are substantially higher than comparable properties.

809

(Tr. pp. 41–42). Mr. Starke also based his estimate on available industrial space in Piscataway. The court was impressed by Mr. Starke's survey of available warehouse/office buildings offered by Murray Construction, the premier developer in Piscataway, which sets the market rate for rentals. *Id.* Mr. Starke's comparables (which were not completed deals, but available space), which average from $4.00–$4.50 per square foot, illustrate the conservative nature of Mr. Lasser's appraisal.

Mr. Edward Dudinski submitted four comparable leases on behalf of debtor. He testified that the property could generate $367,-500 per year or approximately $7.35 per square foot. (Debtor's brief p. 33). However, on cross-examination, it was brought out that the tenants in Mr. Dudinski's comparables were paying premiums in order to stay in their respective locations due to the cost of moving and inconvenience of relocating many people. In addition, Mr. Starke's projected rent assumed an initial $15 per square foot or $225,000 initial capital outlay for tenant fit-up expenses. *Id.*

As stated *infra* Mr. Gavin testified that the property should yield $7.50 per square foot in rentals; however, Mr. Gavin submitted no comparables.

### Valuation Conclusion

Mr. Lasser averaged the figures obtained by the sales comparison and income capitalization methods and arrived at a valuation of $1,755,000. To that figure Mr. Lasser added a price for the extra 2.162 acres of vacant land. Mr. Lasser allowed $50,000 per acre for the 2.162 acres for a total valuation of $1,863,000. (*Id.* at 30).[10] For the reasons above stated the court finds that the appraisal of Mr. Lasser of $1,863,000 is appropriate.

### DISCUSSION

Barclay's seeks to dismiss this case on two grounds. First, Barclays contends that the case should be dismissed because there is no possibility of reorganization since debtor has no income and no other source of funding of a reorganization plan. *See* 11 U.S.C. §§ 1112(b)(1) and (2). In addition, there is no equity in debtor's sole asset with which to fund a plan because the amount due Barclays as set forth in the foreclosure judgment is greater than the appraised value of the property. Barclays argues that its collateral is eroding due to accruing real estate taxes, interest and the vacancy of the premises. Barclays further asserts that the debtor is collaterally estopped from disputing the amount due contained in the final judgment of foreclosure as determined by the State Court. Second, Barclays argues that the case should be dismissed as having been filed in bad faith. 11 U.S.C. § 1112(b).

Debtor counters that there is a reasonable possibility of reorganization that is in prospect. Debtor disputes the appraisal of the property and also disputes the amount due as set forth in the final judgment of foreclosure. Debtor further argues that this court is not bound by principles of collateral estoppel because the issue of amount due was not fully litigated in the State Court. Debtor also contends that it has six additional sources of income to fund a reorganization plan and that the plan was filed in good faith.

This court finds that dismissal is warranted because there is no possibility of a successful reorganization, thus the issue of bad faith thus need not be addressed.[11] In addition, the court finds that collateral estoppel does apply and this court is bound by the amount due as set forth in the final judgment of foreclosure.

10. Debtor disputes Mr. Lasser's value for the two acres. Debtor's expert testified that a prospective tenant would be willing to pay $150,000 per acre in addition to its rent for the extra land. Debtor's expert did not provide any comparables where such a price was paid. This court agrees with Mr. Lasser who argued that the price would be only $50,000 per acre because the property could not be sub-divided as an additional building site due to zoning ordinances and is only suitable for expansion of the existing building. (Lasser App. p. 30). In addition, the condemnation divided the property into an irregular shape and a second building site would be unavailable.

11. The court notes that there is no indication whatsoever in the record that the filing of this bankruptcy proceeding was motivated by anything other than good faith.

### *Dismissal*

 11 U.S.C. § 1112(b) provides that the court may dismiss a case "for cause including—(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; or (2) inability to effectuate a plan." 11 U.S.C. §§ 1112(b)(1), (2). *See also In re Brown (First Jersey National Bank v. Brown)*, 951 F.2d 564, 572 (3d Cir.1991). The statute contains an enumeration of other items; however, "the list is not exhaustive." *Id.*

As noted by the Third Circuit, "however honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Id.* (citing *Tennessee Pub. Co. v. American Nat. Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936)). "[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988)). *See also John Hancock Mutual Life Insur. Co. v. Route 37 Business Park Assocs. (Matter of Route 37 Business Park Assocs.)*, 987 F.2d 154, 157 (3d Cir.1993) (court found debtor did not possess reasonable possibility of a successful reorganization within context of motion to lift the stay). "Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization." *Id.* (citing *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir.1991)).

> "A Chapter 11 case may be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired ... Creditor's likewise, need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated ... The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless."

**12.** Although the Third Circuit found that those facts essentially amounted to a case under 1112(b)(1), the panel also noted that the evidence

*Matter of Woodbrook Assoc's*, 19 F.3d 312, 317 (7th Cir.1994), *rehearing denied* (1994) (citations omitted). As explained by the Seventh Circuit, "bankruptcy courts are given a great deal of discretion to say when enough is enough." *Id.* at 322.

 The Third Circuit has given some guidelines as to when "enough is enough." Where the debtor has no cash flow and no source of income and where the claims against the property of the debtor exceed the property's value, a debtor has not demonstrated a reasonable likelihood of rehabilitation and dismissal may be appropriate. *In re Brown (First Jersey National Bank v. Brown)*, 951 F.2d 564, 571 (3d Cir.1991).

The facts in the Third Circuit case, *In re Brown*, 951 F.2d 564 are strikingly similar to those in this case. That case involved a single asset real estate debtor. In *In re Brown*, the state court had entered foreclosure judgment against the property after a lengthy trial in which numerous defenses had been raised by the debtor. The debtor had no source of income and the sole property was worth $790,000 with $1,770,000 in liens. The debtor disputed the amount due in the case, contending that it was owed credits from the bank. The debtor also contended that the bankruptcy court was not bound by the foreclosure judgment. 951 F.2d at 571. In the *Brown* case, the bankruptcy court denied the motion to dismiss.[12] The Third Circuit remanded the case to the bankruptcy court to reconsider dismissal stating that "we have substantial doubts that the debtor could have been rehabilitated and reorganized at the time the bankruptcy judge denied the motion to dismiss, but the record lacks the certainty needed for entry of judgment on appeal. Section 1112(b)(1) requires the moving party to prove continuing loss or diminution of the estate ... The record does not have evidence on this point." *Id.* at 572. As discussed below, *Brown* also has striking similarities with respect to the issue of collateral estoppel. *See infra.*

In this case the court finds that debtor has no reasonable likelihood of rehabilitation and

"of bad faith was not strong enough to enable us to say that it was established as a matter of law." *Brown*, 951 F.2d at 572.

is unable to effectuate a confirmable plan. These findings constitute grounds for dismissal under both 11 U.S.C. §§ 1112(b)(1) and (2). There is no equity [13] in the property since Barclays has at least a $4,491,563.83 lien against the property.[14] As found above, the value of the property is only $1,863,000. Thus the property has a *negative* $2,628,-563.83 equity. The New Jersey Department of Transportation has deposited $809,700 into escrow as compensation for the condemnation. Thus the total value of debtor's assets available to satisfy Barclay's judgment is $2,672,700 which represents a $1,818,863.83 shortfall. Moreover the court finds that the debtor has no other source of income and no other source of funding, since Mr. Jacobs testified, without contradiction, that the property could not be financed without a tenant. Thus debtor has no funds with which to pay Barclays its claim in full.[15] Finally, the property is suffering a diminution in value as interest and real estate taxes continue to accrue against it; it remains vacant to date. The court notes that this case was filed on September 7, 1995. Thus this relief is not premature as the debtor already has been afforded over one year's relief under title 11.

Debtor argues that it has six additional sources of income: (1) additional condemnation proceeds from a potential recovery in a pending condemnation proceeding which alleges that the State's determination of compensation was incorrect; (2) rents collected from Mazda after entry of the January 1996 final judgment but not yet credited against the amount due Barclays; (3) rents collected from Mazda prior to entry of the January 1996 final judgment which were incorrectly accounted for in the amount due; (4) credit for incorrect interest rate used by Judge Harding in determining the amount due—

debtor alleges that the NJEDA Bond rate should have been used; (5) "off-sets" to which debtor is entitled but which Judge Harding did not properly reflect in the amount due; (6) contributions for tenant fit-up by debtor's principal.

■ For the reasons set forth below, item numbers 3, 4 and 5 (pre-judgment rent credits, NJEDA bond interest rate and off-sets) may not be considered by this court as those issues were decided by Judge Harding in the final judgment of foreclosure and may not be revisited under principles of collateral estoppel. This court also will not consider item number 1 (potential proceeds from an anticipated recovery under a condemnation proceeding). That proceeding is currently pending and debtor's hope to have the condemnation award increased by $1,181,250 to $2,000,000 is not only too speculative, but, in view of this court's finding as to value, totally unrealistic. This court also does not consider item number 6 (capital contributions by debtor's principal for tenant fit-up) because no dollar amount was stated by debtor and additionally, debtor's brief disputes the necessity for tenant fit-up (Debtor's Brief p. 41). Finally, while debtor may be entitled to four months rent in the approximate amount of $183,000 (item number 2),[16] that amount is considerably off-set by interest that has accrued since January 1996 on Barclays' judgment and in any event is *de minimis* in comparison to the $1,818,863.83 shortfall.

Based upon the above factual scenario, this court can only conclude that the case should be dismissed pursuant to 11 U.S.C. 1112(b)(1) for "continuing loss to or diminution of the estate and no reasonable likelihood of rehabilitation," and pursuant to 11 U.S.C.

---

**13.** The term "equity" is defined as "the difference between the value of the property and all encumbrances against it, including the interests of junior lienholders." *Matter of Cardell,* 88 B.R. 627, 631 (Bankr.D.N.J.1988).

**14.** For reasons set forth below, this court will accord collateral estoppel effect to the amount due set forth in the final judgment of foreclosure issued by Judge Harding. Giving the debtor the benefit of the doubt, this court will not account

for interest which has accrued since entry of foreclosure judgment.

**15.** Pursuant to *In re Roach,* 824 F.2d 1370 (3d Cir.1987), debtor can retain this property only by paying Barclays the entire amount due. *Id.*

**16.** There is no evidence that the rent was actually collected by Barclays from Mazda for the period after entry of foreclosure judgment until Mazda's vacating the property.

§ 1112(b)(2) for "inability to effectuate a plan." [17]

### Collateral Estoppel

■ Debtor argues that the amount due on the final judgment of foreclosure determined by Judge Harding in the New Jersey Superior Court is subject to re-examination by this court. Debtor contends that Judge Harding erred in determining the amount due on Barclays' loan because the judgment does not reflect the proper amount that Barclays collected in rent from Mazda (debtor bases this allegation "upon information and belief"). In addition, Judge Harding applied the incorrect interest rate (i.e. the default rate set forth under Barclays' credit agreement and not the rate that would be applicable to NJEDA bonds) and that Barclays buyback of the bonds was improper. Debtor contends that Judge Harding further erred because he improperly relied upon a certification of Barclays officer instead of insisting upon a formal hearing and "proofs." Debtor urges that this court is not barred under principles of collateral estoppel from revisiting those issues because they were not fully litigated in the State Court proceeding. Debtor further argues that the final judgment of foreclosure lacks the requisite finality to have a collateral estoppel effect. Finally, debtor asserts that it has claims relating to alleged violations under the New Jersey Banking Act, N.J.S.A. 17:9A–330, that were not addressed at all by Judge Harding.

■ Collateral estoppel principles apply in bankruptcy proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991); *In re Brown (First Jersey National Bank v. Brown)*, 951 F.2d 564, 571 (3d Cir.1991). Under the full faith and credit statute, 28 U.S.C. § 1738,[18] the preclusive effect of a state court judgment in a subsequent proceeding under federal bankruptcy law is governed by the col-

lateral estoppel law of the state from which the judgment is taken. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1897–98, 72 L.Ed.2d 262 (1982), *rehearing denied by*, 458 U.S. 1133, 103 S.Ct. 20, 73 L.Ed.2d 1405 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980); *In re Brown*, 951 F.2d at 568–69.

The New Jersey Supreme Court has recently set forth the standards in determining the applicability of collateral estoppel:

> For the doctrine of collateral estoppel to apply to foreclose the litigation of an issue, the party asserting the bar must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding ... (2) the issue was actually litigated in the prior proceeding ... [ (] 'the litigant against whom issue preclusion is invoked must have had a full and fair opportunity to litigate the issue in the previous tribunal') ... (3) the court in the prior proceeding issued a final judgment on the merits ... (4) the determination of the issue was essential to the prior judgment ... (collateral estoppel applies ... 'those [m]atters and [f]acts necessary to support the judgment rendered in the prior action') ... and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*Matter of Estate of Dawson*, 136 N.J. 1, 20–21, 641 A.2d 1026 (1994).

■ "Unlike claim preclusion, the effectiveness of issue preclusion, sometimes called collateral estoppel, does not require the entry of a judgment, final in the sense of being appealable.... 'the doctrine of collateral estoppel applies whenever an action is sufficiently firm to be accorded conclusive ef-

---

17. The dismissal of this bankruptcy petition results in the "concomitant dismissal of all pending adversary proceedings" and *inter alia* the bankruptcy court's relinquishment of subject matter jurisdiction to continue the automatic stay provisions of 11 U.S.C. § 362. *In re Ravick Corporation*, 106 B.R. 834, 851 n. 5 (Bankr.D.N.J.1989).

18. In relevant part, the statute provides that the judicial proceedings of any state, territory, or possession of the United States "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory, or Possession from which they are taken." 28 U.S.C. § 1738.

fect.'" *In re Brown*, 951 F.2d at 569. The Third Circuit quoted from the Restatement (Second) of Judgments on the issue of finality that, "insistence on a final and fully appealed judgment can involve needless duplication and expense. to decide the same issue or alternatively, undue delay in a second action while the first action is brought to a complete finish. 'In particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment.'" *Id.* The panel noted that " '[f]inality for purposes of issue preclusion is a more "pliant" concept than it would be in other contexts.' Finality 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated against.'" *Id.* (quoting *Dyndul v. Dyndul*, 620 F.2d 409, 412 (3d Cir.1980)).

This court agrees with Barclays that collateral estoppel does apply to bar relitigation of all of the issues ruled upon by Judge Harding. As such, this court is not in the position to make a determination whether Judge Harding's decision relied upon proper proofs or to visit the merits of Judge Harding's conclusions. To do so, would defeat the purpose of collateral estoppel to avoid unnecessary duplication of judicial resources. This court also finds that the final judgment of foreclosure does have the requisite finality to have collateral estoppel effect as is required under New Jersey law. Finally, this court rules that the issue of applicability of the New Jersey Banking Act, *N.J.S.A.* 17:9A–330, is precluded under principles of the entire controversy doctrine.

In applying the five prong test set forth by the New Jersey Supreme Court this court finds that collateral estoppel applies to bar relitigation of the amount due as set forth in the final judgment of foreclosure.

(1) *Identical Issue*—There is no dispute that the issue to be precluded (amount due) is identical to the issue decided by Judge Harding. The amount due is set forth in the final judgment of foreclosure itself. Furthermore, the Harding Opinion, squarely addresses the subsidiary issues of off-sets, buy back of NJEDA bonds and the relevant in-

terest rate to be used to calculate amount due, and credits owed to debtor for rents paid by Mazda to Barclays. Judge Harding's opinion also indicates the sources of information upon which he relied.

(2) *Actually Litigated*—The issue of amount due was actually litigated in the prior proceeding. The foreclosure trial lasted ten weeks. During the trial evidence was presented and testimony was heard by Barclays' witness as to amount due. After the trial and issuance of Judge Harding's twenty-five page opinion, the parties further litigated the form of judgment, in particular the amount due. Judge Harding received eleven letters from the parties which disputed the amount due. In those letters debtor set forth its objections concerning interest rate, NJEDA bonds, and off-sets.

Judge Harding issued yet another opinion. In that eight page opinion Judge Harding stated, "Plaintiff offered into evidence those calculations as the due amounts resulting from the default, without any objection dispute or contradiction. I do not believe it is appropriate for the Court to now allow defendants 'a second bite of the apple,' by challenging undisputed testimony through a new hearing about those calculations. That opportunity was available during the course of the trial. It was not pursued by the defendants." (Harding Op. p. 3).

Despite Judge Harding's belief that debtor was estopped from raising opposition to amount due, Judge Harding nevertheless addressed the merits of debtor's objections and found that the amount due was correct. Again in January 1996, upon entry of foreclosure judgment, debtor wrote to Judge Harding. The final judgment of ·foreclosure states that Judge Harding considered those objections and Barclays' response to those issues before issuing the order. (*See* Final Judgment of Foreclosure).

The court disagrees that debtor did not have an opportunity to litigate the matter because there was no formal hearing on the amount due. As noted by Judge Harding, Barclays offered calculations as to amount due into evidence during the trial without objections. Furthermore, the flurry of elev-

en letters in September 1995 resulting in an eight page letter opinion by Judge Harding addressing the objections to amount due, plus the additional exchange of letters in January 1996, afforded debtor not only an ample opportunity to litigate the amount due, but an extraordinary opportunity to litigate the issue.

(3) *Final Judgment*—The court also finds that the final judgment of foreclosure has the requisite finality to be accorded collateral estoppel effect, even though that decision has been appealed to the Appellate Division. As held by the Third Circuit, finality is a "pliant" concept for purposes of collateral estoppel. *Dyndul v. Dyndul,* 620 F.2d at 412. Furthermore, the Third Circuit has found that insistence upon a fully appealed judgment often involves needless duplication and expense to decide the same issue, and that the wisest course is to regard the prior decision as final for the purpose of issue preclusion. *In re Brown,* 951 F.2d at 569.

The fact that this case is on appeal does not help the debtor. Since there is no stay pending appeal in effect in the state court, the judgment of Judge Harding is the law of the case in the foreclosure proceeding.[19]

(4) *Essential to Judgment and Same Parties*—The parties do not dispute that the issue was essential to the judgment or that (5) the parties are the same.

For the above reasons the court finds that the amount due to Barclays on its claim has preclusive effect under principles of collateral estoppel and may not be revisited by this court.

Even if the court were to find that it was not bound by collateral estoppel, it would still be improper to decide the amount due. The Third Circuit has stated that it borders on abuse of discretion for a bankruptcy court to adjudicate the amount due when a State Court has decided the issue of final judgment of foreclosure:

> Conceivably, the bankruptcy court could be bound by the summary judgment as to liability, yet be free to adjudicate issues having to do with the amount due. We think that course of action would be inappropriate here.
>
> The state court is familiar with the background of the case and has explored some of the facets that bear on the claimed credit. To some extent, therefore, allowing the bankruptcy judge to step in at this point would result in duplication of effort and added expense to the parties. Moreover, we see no reason why the state court would not be competent and impartial in making the necessary determinations.
>
> \* \* \* \* \* \*
>
> We conclude that in the circumstances it would not be consistent with a reasonable exercise of discretion by the bankruptcy court to supersede the exercise of jurisdiction by the New Jersey Courts.

*Id.* at 569–70.[20]

After having conducted a ten week trial and having issued both a twenty-five page opinion, an eight page opinion and a final judgment of foreclosure, Judge Harding is the best person to decide the issue of amount due. For this court to reconstruct the entire record and decide a different amount due would be a useless waste of judicial resources and would border upon abuse of discretion.

### *Entire Controversy Doctrine*

■ Debtor also claims that Barclays violated the provisions of the New Jersey Bank-

---

**19.** *See Sisler v. Gannett Co., Inc.,* 222 N.J.Super. 153, 159, 536 A.2d 299 (App.Div.1987) ("law of the case doctrine requires judges to respect unreversed decisions made during the trial by the same court or a higher court regarding questions of law."); *State v. Hale,* 127 N.J.Super. 407, 411, 317 A.2d 731 (App.Div.1974) (purpose of law of the case is to avoid repetitious litigation of the same issue during the course of a single trial.); *Metro Container Corp. v. Teamsters Local Union No. 676,* Civ.A. No. 86–6888, 1987 WL 15225 (E.D.Pa.1987) (Even though case was appealed, "law of the case doctrine" did apply in proceed-

ing where motion for stay pending appeal was denied.).

**20.** In the *Brown* case the state court had not yet determined the amount due, and the Third Circuit found it improper for the bankruptcy court to decide that issue. *Brown,* 951 F.2d at 569–70. In this case where the state court has already made the determination of amount due, it would be even more inappropriate for this court to "supersede the exercise of jurisdiction by the New Jersey court." *Id.*

ing Act. *N.J.S.A.* 17:9A–330. Debtor did not raise this issue during litigation before Judge Harding but in a post-judgment letter to the court. Therefore, the issue was not adjudicated.[21]

▬▬▬ The entire controversy doctrine requires the raising in the first proceeding of all affirmative claims that a party might have against another party, including counter-claims and cross-claims as well as joinder of all parties with a material interest in the controversy (i.e. those who can effect or be effected by the judicial outcome of the controversy). *Circle Chevrolet v. Giordano, Halleran & Ciesla,* 142 N.J. 280, 289, 662 A.2d 509 (1995). At the time of the original action, if the claim was known had arisen or accrued, the doctrine bars the claim. *Id.* at 290, 662 A.2d 509. Application of the rule is discretionary and best decided on a case-by-case basis. *Id.*

The New Jersey Supreme Court has given some guidelines as to whether claims are related such that they should be brought in a single action under the entire controversy doctrine. *DiTrolio v. Antiles,* 142 N.J. 253, 268, 662 A.2d 494 (1995). The ultimate test, however, is fairness. *Circle Chevrolet,* 142 N.J. at 290, 662 A.2d 509.

> [T]he central consideration is whether the claims against the different parties arise from related facts or the same transaction or series of transactions ... It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding.... The test for whether claims are "related" ... [is] if parties or persons will, after final judgment is entered, be likely to have to engage in additional litigation to conclusively dispose of their respective bundles of rights and liabilities that derive

from a single transaction or related series of transactions, the omitted components of the dispute or controversy must be regarded as constituting an element of one mandatory unit of litigation.

*DiTrolio v. Antiles,* 142 N.J. at 267–68, 662 A.2d 494.

In this case debtor is raising the issue of Barclays violation of the New Jersey Banking Act as an affirmative defense or counter-claim. The parties are the same (Barclays and debtor) as in the original proceeding, and the claim was known or had arisen at the time of the original action because debtor contends that the violations occurred during the negotiation of the original financing. The claim arises from the same core set of facts upon which the foreclosure action and debtor's defenses to those actions (i.e. settlement, interest rates) are based, namely the negotiation, execution and performance of the credit agreement. In addition, the claim is related to the original action, because if successful, would require re-litigation of the entire matter in New York state courts to resolve the "respective bundles of rights and liabilities that derive from a single transaction or related series of transactions." Thus this court finds that the issue of violation of the New Jersey Banking Act is barred by the entire controversy doctrine.

## CONCLUSION

For all of the above reasons, this court finds that the case should be dismissed under both 11 U.S.C. 1112(b)(1) and (b)(2). The motion to dismiss is granted. Counsel for Barclays shall submit an appropriate form of order within ten (10) days.

---

21. As noted by Judge Harding concerning the claim of violation of the New Jersey Banking Act, "[s]uch issue was never raised in any proceeding for which I rendered a judgment or opinion. This issue was first raised to me by letter from Raritan's counsel dated September 21 after Final Judgment had been entered on September 19.... This court has never been called upon to decide whether plaintiff transacted business in New Jersey, as defendant now contends. Defendant withdrew its motion on this issue and then filed this appeal." *Letter of Judge Harding* dated November 1, 1995. (While Judge Harding referred to Raritan Building Assoc., that opinion is relevant to this case because debtor's trial on foreclosure was consolidated with the trial of Raritan and the matters were heard together.) Judge Harding expressed his opinion that Raritan waived its right to raise the issue of the New Jersey Banking Act, and that Raritan's position had no merit in any event. *Id.* at 2.