**In re CUSTOM DISTRIBUTION SERVICES, INC., debtor.**

**CUSTOM DISTRIBUTION SERVICES, INC., plaintiff,**

**v.**

**CITY OF PERTH AMBOY TAX ASSESSOR, defendant.**

**Bankruptcy No. 95–37206.
Adversary No. 95–3218.**

United States Bankruptcy Court,
D. New Jersey.

Dec. 17, 1997.

Wilentz, Goldman & Spitzer, Louis T. De Lucia, Woodbridge, NJ, for debtor.

McManimon & Scotland, John B. Hall, Newark, NJ, for City of Perth Amboy.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### *PROCEDURAL BACKGROUND*

This matter comes before the court as an adversary proceeding brought by debtor and debtor-in-possession, Custom Distribution Services, Inc. ("CDS") against the City of Perth Amboy, Tax Assessor ("the City"), to determine, modify, and reduce the real property taxes assessed by the City, pursuant to 11 U.S.C. § 505(a).

CDS contends that the City's valuations of real property owned by CDS and located in the city of Perth Amboy (the "Subject Property") have, for the tax years 1992 through 1996, materially overstated the full and fair market value of the Subject Property. As such, CDS contends that it has overpaid its property tax obligations to the City for those years, and seeks the amount it claims it has overpaid in damages.

The City disputes CDS's claims and asserts that the assessments made upon the Subject Property were at their full and fair value and that taxes on the Subject Property were assessed in a manner substantially similar to other like real property within the city

of Perth Amboy. Further, the City contends that plaintiff's action with respect to tax years 1991 and 1994 is barred by 11 U.S.C. § 505(a)(2)(A) in that those tax years were subject to a prior adjudication by the New Jersey Tax Court, and that, for the remaining tax years not barred by § 505(a)(2)(A), the court should nonetheless exercise its discretion to abstain from reducing the current tax assessment. Lastly, the City has filed a counterclaim against CDS which seeks to increase the assessed valuations of the Subject Property for 1990 through 1996.

At a plenary hearing held on May 28, 1997 witnesses testified for both sides and evidence was entered into the record. CDS submitted a post-hearing brief on June 20, 1997; the City submitted its brief, and CDS submitted its reply brief on July 21, 1997.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. §§ 157(a)(2)(A), (B) and (O).

### FACTUAL FINDINGS

#### 1. The Parties

Debtor and Debtor–in–Possession, Custom Distribution, Inc.. ("CDS"), is a corporation and the owner of environmentally contaminated property in the City of Perth Amboy, NJ which is the subject of the instant dispute. The City of Perth Amboy (the "City") is a municipality in the State of New Jersey; and the City of Perth Amboy Tax Assessor is an agent of the City.

#### 2. The Subject Property

(a) History of the Subject Property

The subject of the instant dispute is an industrial park consisting of approximately 22.62 acres, formerly known as the National lead Industries/Dutch Boy Paint Facility and located in Perth Amboy, New Jersey. This property was owned for approximately seventy years by NL Industries, Inc., the successor to the National Lead Company. *Custom Distribution Services, Inc. v. NL*

*Industries, Inc.,* Mem. Op., No. 96–1237 at 1–2 (D.N.J. January 7, 1997). In 1979, NL sold the Subject Property to the Arthur Kill Urban Industrial Park, Inc. ("AKUI"), which financed its purchase with a bond issued in favor of NL Industries by the New Jersey Economic Development Authority. *Id.* AKUI defaulted on its obligations under the bond in August, 1979 and NL Industries assigned the bond to CDS. Thereafter, CDS acquired the subject property in August 1981.

Presently, the Subject Property consists of 8.04 acres containing 15 structures in various states of decay and use, occupied by approximately 11 tenants (as of October, 1996 rent rolls). *See* City Expert Appraisal at 85; CDS Expert Appraisal at 66. The remaining 14.58 acres are unoccupied and are either entirely vacant or contain uninhabitable buildings.

(b) Environmental Litigation Involving the Subject Property

Since at least 1904, the Subject Property has been used for "metals refining and smelting, oil tank storage, and other industrial operations." *Custom Distribution v. NL Industries,* Mem. Op., No. 96–1237 at 2 (January 6, 1997). As a result of these heavy industrial uses to which the Subject Property was put, it has been the subject of environmental litigation. In 1987, CDS and NL Industries jointly commissioned Killam Associates, consulting engineers, to conduct a site investigation to determine the nature and extent of environmental contamination at the Subject Property. *See* Certification of Sharon Lippett, dated June 23, 1997 (the "Lippett Certification"). The results of the site investigation by Killam Associates (the "Killam Report") indicated that there were elevated concentrations of metals and other hazardous organic compounds throughout the property.[1]

In 1992, the United States Environmental Protection Agency ("EPA") identified CDS

---

**1.** The Killam Report was accepted as evidence of environmental contamination on the site by the court in *Custom Distribution v. NL Industries,* Mem. Op., No. 96–1237 (January 6, 1997). In its brief, the City nonetheless objects to the submission of the Killam Report by CDS's counsel as violative of Fed.R.Evid. 702 and N.J. R. Evid. 702. Aside from issues of collateral and judicial estoppel, this court rejects the City's argument on the merits, and finds that the Killam Report provides sufficient credible evidence of contamination on the Property.

and NL Industries as potentially responsible parties under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9606 *et seq.*, for the contamination on the Subject Property. *Custom Distribution v. NL Industries* at 3. The property has been put on the National Priority List pursuant to 42 U.S.C. § 9605(8) and is listed as a "Superfund Site" for cleanup under CERCLA. In addition, the property is on the Comprehensive Site List with the New Jersey Department of Environmental Protection ("NJDEP") under the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K–6 *et seq.* The EPA directed both NL Industries and CDS to clean up certain portions of the Subject Property. *Id.* The EPA estimated that the cost to NL would be approximately $1.55 million and that the cost of cleanup for CDS would be approximately $1.39 million. *Id.* NL Industries engaged in a cleanup of the portion of the Subject Property as directed by the EPA, but CDS did not remediate its portion of the Subject Property. Instead, on November 14, 1994, CDS filed a nine-count complaint against NL in the Superior Court of New Jersey, Chancery Division, Middlesex County alleging that NL Industries was liable for the environmental contamination under New Jersey's Spill Act, and liable in damages to CDS for among other things, failure to warn CDS of the environmental contamination and breach of contract. *Id.* at 5.

On October 12, 1994 CDS filed a petition for reorganization under chapter 11 of the Bankruptcy Code, and the state action was removed to Federal District Court. NL Industries thereafter moved for summary judgment on all counts of CDS's state law claims before the Honorable Garrett E. Brown, U.S.D.J. On January 6, 1997, the district court entered an order granting NL Industries' motion for summary judgment on CDS's state law claims in that the record was

replete as to the environmental contamination and CDS's knowledge thereof. *Id.* at 28.

3. *The Instant Proceeding*

(a) Tax Years Subject to Review by the Court

In this tax appeal, CDS seeks a reduction in the valuation of the Subject Property and a refund [2] of overpaid taxes (that CDS claims result from an overstatement of the value of the Subject Property) for the tax years 1992 through 1996. *See Amended Pre–Trial Memorandum of CDS,* ¶ 4(b).

On March 28, 1994, CDS filed a complaint in the Tax Court of New Jersey against the City, claiming that the City had overstated the value of the Subject Property, and seeking a reduction of the real property tax assessment of the City for tax year 1994, and a refund of overpaid taxes with interest and costs. *See Lippett Certification,* Exhibit B. Before the merits of the complaint were addressed by the New Jersey Tax Court, the complaint was withdrawn and dismissed by that court on May 23, 1995 at the request of CDS.

At a hearing before this court on May 28, 1997 (the "May 28th Hearing"), a motion was made by counsel for CDS requesting that the court exercise its discretion under § 505(a)(2)(A) of the Bankruptcy Code to consider CDS's appeal with respect to tax years 1992, 1993 and 1994.

The court then heard counsel for CDS on its motion to compel this court to exercise its discretion to consider tax year 1994. In its colloquy with counsel for CDS, this court noted CDS's withdrawal of its appeal both before adjudication by the New Jersey Tax Court and before it's chapter 11 filing, made the court's exercise of its discretion to review tax year 1994 under § 505(a)(2)(A) a "problematic" decision. Tr. at 16. Nonetheless, this court made no formal ruling as to whether tax year 1994 would be considered in CDS's tax appeal.[3]

---

2. CDS suggests that if this court finds that CDS has overpaid taxes as a result of the City's overstatement of value of the Subject Property, any excess amount owed to CDS can be applied in satisfaction of a lien on the Subject Property held by the City of Perth Amboy from CDS's unpaid bills for water usage.

3. *See infra,* for discussion of the legal issues of inclusion of tax year 1994 in CDS's appeal under § 505(a)(2)(A).

## VALUATION OF THE PROPERTY

### I. Methods of Real Estate Valuation

(a) Real Estate Valuation Models

There are three basic approaches commonly used to value real estate: the cost approach, the sales comparison (or market data) approach, and the income capitalization approach, or any combination of these three. (*The Appraisal of Real Estate*, American Institute of Real Estate Appraisers, 9th ed. (1987)).

The cost approach estimates the value of the subject property if vacant and available to be put to its "highest and best use."[4] To the highest and best use amount is added the amount that it would currently cost to reproduce the existing improvements on the property, less depreciation for deterioration, and obsolescence of those existing improvements. Finally, the expected depreciation of the reproduced improvements is added to the highest and best use amount resulting in the estimated market value computed under the cost approach. (*See id.*; Hedden App. at 15; Hiller App. at 15).

The sales comparison approach to valuation is a method of estimating market value by comparing the subject property to similar properties that have been recently sold or listed for sale in the same or competing areas. Upward or downward adjustments to the price per square foot of the comparable properties are made to account for the differences between the subject property and the sales comparables. *See In re 865 Centennial Avenue Associates*, 200 B.R. 800 (Bankr. D.N.J.1996); (*see also* Hedden App. at 15; Hiller App. at 17). This technique of appraisal assumes that the probable market value of the real estate is established by similar transactions between informed buyers and sellers in the marketplace.

The income capitalization approach to valuation of real estate consists of certain techniques and mathematical procedures used to analyze a property's capacity to generate future monetary benefits and to convert those future monetary benefits into an indi-

cation of their present value. *In re 865 Centennial Avenue Associates*, 200 B.R. at 815. The future monetary benefits of the property are derived from the estimated future net income of the property, which is determined by subtracting estimated future expenses (i.e., taxes, insurance, utilities, commissions, management fees) from gross economic rent (an estimate of potential rental income less standard allowances for vacancies or losses in rental income). *Id.* The resultant future net income is then discounted using a predetermined capitalization rate. (*Id.*; *See also* Hedden App. at 15; Hiller App. at 19).

(b) "Excess Land"

The parties devoted substantial portions of their post-trial briefs to the issue of the impact of the value of so-called "excess land" located on the Property. In real estate appraisals, excess land is defined as that land which is beyond the normal needs of particular or current use of the land as a whole. (American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 290 (9th ed.1987)). The parties disagreed as to whether the 14.58 acres not currently in use, qualifies for valuation as excess land under existing law.

### II. Valuation Methods Employed by the Parties

1. The City Appraisal of the Property

(a) Methodology and Conclusions of the Hiller Appraisal

Michael Hiller is a highly respected real estate appraiser and consultant in the State of New Jersey. Mr. Hiller is a member of the American Society of Appraisers (ASA), and is both a certified tax assessor and a certified general appraiser in the State of New Jersey. Counsel for CDS stipulated to Mr. Hiller's qualifications as an expert appraiser, and consequently, Mr. Hiller was qualified by this court to testify on behalf of the City as an expert commercial real estate

---

**4.** "Highest and best use" is a term of art in the lexicon of real estate appraisal which is discussed in detail *infra* p. 157.

appraiser at the May 28th Hearing. The City offered into evidence a current appraisal of the value of the Property, prepared by Mr. Hiller and dated May 7, 1997. In determining the fair market value of the property, Mr. Hiller used both the income capitalization approach, and the sales comparison approach. Mr. Hiller asserted that the cost approach "is not considered a viable, nor reliable valuation method for the subject property [because] estimating physical and functional obsolescence [for many of the structures on the property] would be an exercise in subjective speculation." (Hiller App. at 19). Though he employed the sales comparison approach, he stated that the sales comparison approach does not yield an accurate result because of the difficulty of finding even "remotely similar" properties that would require reasonable, and not unrealistic adjustments. *Id.*

Notably, in his appraisal, Mr. Hiller stated that "it is a basic assumption of [the] appraisal that ... this property is not impacted by any hazardous environmental conditions." *Id.* at 8. Thus, in his computations of the valuation of the land, Mr. Hiller did not account for the nearly $1.4 million EPA-estimated environmental clean-up costs.[5]

### (b) The Sales Approach of the City

In evaluating the Property, Mr. Hiller examined six comparable sales that occurred in areas surrounding the City of Perth Amboy (but none of the comparable sales were actually transacted in the City itself). Without much discussion of the methodology employed, or the adjustments made to the comparable sale prices, Mr. Hiller concluded that the estimated per acre value for the CDS property over the entire period is $135,000 per acre.

### (c) The Income Capitalization Approach of the City

As noted above, Mr. Hiller also calculated values for the Property under the income capitalization approach. The analysis presented by Mr. Hiller is quite rigorous. He employed actual rent rolls and actual financial data (obtained from the income statements and balance sheets) of CDS for the years 1990 through 1995, with gross expenses stabilized over the period of 1990 through 1995. His figures for gross and net income [6], and expenses, are summarized as follows:

|  | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|
| Gross Income | $522,466 | $435,949 | $398,491 | $373,698 | $401,067 | $468,936 |
| Gross Expenses | $190,182 | $160,276 | $168,471 | $152,593 | $164,774 | $181,890 |
| Net Income | $352,284 | $275,673 | $230,020 | $221,105 | $236,293 | $287,046 |

(Hiller App. at 89). For the capitalization rate, Mr. Hiller employed the "Mortgage/Equity Band of Investment" which is a weighted average of: (1) the prevailing rate on a 25-year mortgage, which Mr. Hiller assumed to be 9.50%, and (2) an annual dividend rate on equity rate assumed by Mr. Hiller to be 12.0%. *Id.* at 92. Mr. Hiller ascribed a 65% weight to the 9.50% mortgage rate and a 35%

weight to the 12.0% equity rate. *Id.* The resulting weighted average was a blended mortgage/equity rate of approximately 11.0%, to which was added the effective tax rate. *Id.* The following capitalization rates were computed: for 1991, 13.02%; for 1992, 13.31%, for 1993, 13.33%, for 1994, 13.97%, for 1995, 14.10%, and for 1996, 13.86%. *Id.*

---

**5.** In the May 28th Hearing, however, Mr. Hiller and counsel for the City stipulated that the costs required to remediate the property would be $1,390,000. Tr. at 101. Mr. Hiller admitted that the valuations for the property for the years 1994 and 1995 should be reduced by $139,000 in each of those years. He based this $139,000 reduction per year on a straight-line basis over an assumed ten-year remediation period. *Id.* at 101–02.

**6.** Mr. Hiller uses *actual* rental data for the computation of gross income, as opposed to using comparables to determine a market rent. He cites the impossibility of finding comparables that would accurately reflect the situation on the CDS Property.

Mr. Hiller's appraisal of the Property also reflects the value of "excess land."[7] Mr. Hiller cited that the local zoning ordinance requires 40%, or approximately 8 acres to support improvements on the land. He correctly conceded that the remaining approximately 14.58 acres of land do not generate gross rental income, and as such, cannot be included in the valuation under the income capitalization model. (Hiller App. at 71). He suggested, however, that the "excess land" (less the costs to demolish dilapidated structures and remove debris from the excess 14 acres) nonetheless enhances the overall value of the Property. Using the $135,-000 per acre figure computed under the sales comparison approach above, Mr. Hiller concluded that the value of the excess 14 .58 acres of land at its "highest and best use" is equal to $1,968,300 (14.58 @ $135,000 per acre). *Id.* at 71. Mr. Hiller adjusted this $1,968,300 amount to reflect the cost of debris removal and demolition (as per a contractor's estimate) over the period of 1990 through 1996.[8] *Id.*

Based upon the above data, Mr. Hiller concluded that the valuation of the Property, including the computed excess land values was as follows:

| Valuation Date | Tax Year | Income Capitalization | Adjusted Excess Land Value | Appraisal Value of Property [9] |
|---|---|---|---|---|
| October 1,1990 | 1991 | $2,706,000 | $1,206,900 | $3,912,900 |
| October 1,1991 | 1992 | $2,071,000 | $1,168,800 | $3,239,800 |
| October 1,1992 | 1993 | $1,726,000 | $1,128,800 | $2,854,800 |
| October 1,1993 | 1994 | $1,583,000 | $1,086,800 | $2,669,800 |
| October 1,1994 | 1995 | $1,676,000 | $1,042,800 | $2,718,800 |
| October 1,1995 | 1996 | $2,071,000 | $ 996,500 | $3,067,500 |

(Hiller App. at 3).

### 2. The CDS Appraisal of the Property

(a) Methodology and Conclusions of the Hedden Appraisal

Testifying for CDS was Michael P. Hedden, as well, a highly respected real estate appraiser and consultant in the State of New Jersey. Mr. Hedden is a Member of the Appraisal Institute (MAI), and is both a licensed real estate broker and a state certified general appraiser in the State of New Jersey. Mr. Hedden was qualified by this court as an expert commercial real estate appraiser to testify on behalf of CDS at the May 28th Hearing.[10] CDS offered into evi-

---

**7.** Excess land is a portion of the Property that qualifies under New Jersey law as the "highest and best use" for the property (see *infra* pp. 157–158).

**8.** At the May 28th Hearing, Mr. Hiller adjusted his calculation by adding to the costs of demolition, the costs of the environmental clean-up, amortized over a 10-year period.

**9.** As per the City's stipulation at the May 28th Hearing, the City suggested that the value of the property should be further reduced by $139,000 per year (to reflect the $1,390,000 in clean-up costs amortized over an assumed ten-year remediation). (*See* discussion of remediation, *infra* p. 154).

**10.** The City objects to Mr. Hedden's qualifications to testify as to the valuation of the Property because the City asserts that Mr. Hedden lacks experience, knowledge, skill and training in matters of environmental contamination, which Mr. Hedden cites as impairing the value of the Property. Tr. at 35. The City's contention lacks merit. This court found at the May 28th Hearing that "Mr. Hedden is qualified to testify with respect to...the underlying issue [of value of the land]; not the chemical nature of the contaminants..., but rather the effect upon what the [government agency] reports and other information [on environmental contamination] have upon the marketability and the market value of the property." *Id.* at 37.

dence a current appraisal of the value of the Property, prepared by Mr. Hedden and dated May 16, 1997. In determining a fair market value for the property, Mr. Hedden used a hybrid valuation methodology in which the sales comparison approach and the income capitalization approach were used in conjunction to compute an unimpaired market value estimate ("UMVE") of the property. Mr. Hedden asserted that "because of the lack of comparable land sales and the advanced age and the significant accrued depreciation suffered by the [Property]," the cost approach was not considered in the calculation of UMVE. *Id.* at 16.

### (b) Sales Comparison Component of the Hybrid Methodology

As noted above, Mr. Hedden employed a hybrid method of valuation of the CDS property, which relied in part, on a sales comparison methodology for one of its components. He began by identifying fifteen comparable sales, six of which were transacted in the City of Perth Amboy, and nine of which took place in municipalities immediately surrounding the area. In his thorough analysis of the various comparable sales, Mr. Hedden made percentage sales price adjustments for, *inter alia*, type of financing used for the sale, the conditions of the sale, market conditions, location, size, age, land-to-building ratios, and functional utility. He concluded, based upon the above sales comparables and adjustments thereto, that the indicated building value of the Property is $10.30 per square foot. *Id.* at 58. Mr. Hedden asserted that the Property is comprised of approximately 140,780 square feet, for a total value under the sales comparable approach of approximately $1,450,000 (140,780 square feet @ $10.30 per square foot).

### (c) Income Capitalization Component of the Hybrid Methodology

Mr. Hedden's hybrid methodology also relied, in part, on the income capitalization method of real estate appraisal. In order to compute the gross rental income for the Property, Mr. Hedden reviewed the rent roll of CDS, and identified twelve comparable leases (which Hedden claims are representative of the CDS Property at its "highest and best use"). All of the comparable leases were for space located in the City of Perth Amboy. *Id.* at 60–65. Mr. Hedden contended that because the Property was being analyzed at its "highest and best use," it would be inaccurate to derive gross income for the Property from the current rent roll. *Id.* at 59.

From the comparable leases, Mr. Hedden derived an average stabilized gross income of $492,730 for the years 1992 through 1996. He also deducted from the stabilized gross income for the years 1992 through 1996 an amount of $73,910 representing a stabilized allowance for vacancies and credit losses. As for gross expenses, Hedden adopted a stabilized gross operating expense of $1.25 per square foot which reflected management fees (estimated at 5% of gross income), broker fees (estimated at 3% of gross income), as well as structural maintenance costs (estimated at 2% of gross income). *Id.* at 72.

In computing the capitalization rate, Mr. Hedden considered a mortgage-equity method, which looked to both the prevailing mortgage interest rates, equity dividends and tax rates for the years in question. He then blended the mortgage and equity rates to arrive at a capitalization rate for each year, making an upward adjustment to the capitalization rate to account for the effective tax rate. Mr. Hedden arrived at the following capitalization rates (rounded), which were quite similar to those computed by the City's real estate expert: for 1992, 13.59%; for 1993, 13.60%; for 1994, 14.24%; for 1995, 14.37%; and for 1996, 14.15%.

Based upon the above assumptions, Mr. Hedden calculated that the value of the property under the income capitalization approach should be as follows:

| Valuation Date | Tax Year | Income Capitalization Value |
|---|---|---|
| October 1, 1991 | 1992 | $1,480,000 |
| October 1, 1992 | 1993 | $1,480,000 |
| October 1, 1993 | 1994 | $1,410,000 |
| October 1, 1994 | 1995 | $1,400,000 |
| October 1, 1995 | 1996 | $1,420,000 |

(Hedden App. at 80).

#### (d) Hybrid Valuation Methodology

In Hedden's appraisal, the unimpaired market value estimate ("UMVE") of the property was a "blend" of the unimpaired market value computed using the sales comparison approach and the unimpaired market value of the property computed using the income capitalization approach. The blended figure used for UMVE of the property was then adjusted (by a "reversion" factor and an "income" factor, discussed below) to arrive at the impaired market value estimate ("IMVE"), which Hedden asserted was the proper basis for tax assessments. *Id.* The IMVE was computed by adjusting the UMVE to reflect the EPA-estimated $1.4 million in remediation cost as well as the purported adjustments made by putative purchasers for the "stigma" of environmental contamination on the Property. *Id.*

The impact of the environmental contamination on the Property's value was captured by calculating the anticipated future value of the Property in two categories: (1) a "reversion" category, and (2) an "income" category. *Id.*

In the "reversion" category, the first step in the calculus was to compute expected future UMVE of the Property, which was accomplished by adjusting the present UMVE to reflect a constant estimated Consumer Price Index inflation rate of 2.5% per year over a ten-year period (which is the time estimated for the complete environmental remediation of the Property). *Id.* The second step in calculating the "reversion" amount was to compute the "stigma-adjustment" to the future UMVE. This was done by deducting from the computed future UMVE at the end of this ten-year period, a twenty percent projected loss in value owing to the "stigma" attached to the Property from having once been contaminated. *Id.* The "stigma-adjusted" future UMVE was then discounted by a rate of 14% to compute the value today of this future amount. *Id.* The next phase of the calculation of the "reversion" amount focused on the environmental clean-up costs. As with the future UMVE, the estimated future value of the clean-up was calculated by adjusting for inflation over a ten-year remediation period. *Id.* The resultant future value of the environmental clean-up costs were then discounted to their present value on a straight-line basis over ten years, using a discount rate equal to the assumed mortgage rate of 9.75%. Finally, to compute the "reversion" amount, the straight-line present value of environmental clean-up costs are subtracted from the present value of the "stigma-adjusted" future UMVE. *Id.* at 81.

The "income" category examined the present value of the net annual income stream resulting from rent from leases and other income derived from the use of the property, and deducted from the present value of this income stream, the costs of environmental monitoring during the ten-year remediation period. *Id.* at 14. The income figures used by Mr. Hedden for the purpose of these calculations assumed a stabilized average income of $197,963, net of an assumed $3,000 amount for average annual monitoring costs over the entire ten-year period. *Id.* at 81–82. The ten-year level income stream was then discounted to present value by using an annuity factor (or coefficient from a standard compound interest table) for a selected discount rate of 12%, yielding the "income" category amount.

To arrive at the IMVE, the computed "income" category amount was subtracted from the computed "reversion" category amount. Mr. Hedden asserted that the resulting IMVE, which considers the environmental contamination, was the proper valuation of the Property.

#### (e) Excess Land

In the CDS expert appraisal, Mr. Hedden addressed the issue concerning the value of

the approximately 14.58 acres of excess land. Mr. Hedden stated that the *unimpaired* market value of the land would have a value of approximately $75,000 per acre (which Mr. Hedden stated is "consistent with current market values for approved, ready-to-go sites" in the Perth Amboy area). *Id.* at 24. He concluded, however, that the contribution to the market value of the excess land is offset by the demolition costs, and "the risk, [environmental] contingencies and need for a purchaser's profit." *Id.* Thus, Mr. Hedden asserted that the excess land was of no additional value, and contributed no value whatsoever to the valuation of the entire parcel.

#### (f) Final Valuation of Hedden Appraisal

Based upon the above data, Mr. Hedden set forth in rigorous detail his calculations, and concluded that, employing the hybrid valuation methodology discussed above, the valuation of the Property was as follows:

| Market Valuation Date | Tax Year | Appraisal Value of Property |
|---|---|---|
| October 1, 1991 | 1992 | $660,000 |
| October 1, 1992 | 1993 | $660,000 |
| October 1, 1993 | 1994 | $650,000 |
| October 1, 1994 | 1995 | $650,000 |
| October 1, 1995 | 1996 | $650,000 |

(Hedden App. at 1).

### DISCUSSION

The parties do not dispute that the bankruptcy court has the authority to determine tax assessments of municipalities. Rather the parties dispute the scope and extent of that authority. Debtor contends that the court may determine the assessment for all tax years, even those which have been adjudicated by the Tax Court. The City of Perth Amboy, however, argues that the court should examine only those years which have never been the subject of any judicial proceeding and for which the Debtor has complied with all of the requisite state law requirements. The parties also dispute the methodology which the court should use to determine the proper tax assessment of contaminated property. Debtor contends that under New Jersey State law, the court must conduct a valuation which takes into consideration the full effect of cleanup costs as well as the stigma of contaminated property. *See Inmar Assocs., Inc. v. Borough of Carlstadt,* 112 N.J. 593, 549 A.2d 38 (1988). Debtor further argues that no value may be given to excess land as the property has not met the legal standard for highest and best use. The City, on the other hand, asserts that a reduction in tax assessment for stigma is rarely made, and only upon the most extraordinary showing of hard evidence. The city also contends that cleanup costs only may be considered on a straight-line amortized basis. Finally, the City states that the excess land must be fully accounted for at its highest and best use.

### I. Tax Years Subject To Tax Assessment, Pursuant to 11 U.S.C. § 505(a)

The bankruptcy court has authority to adjudicate tax assessments of real property pursuant to 11 U.S.C. § 505(a). 11 U.S.C. § 505(a) provides:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine—

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or

(B) any right of the estate to a tax refund, before the earlier of—

**148**

(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or (ii) a determination by such governmental unit of such request.

Section 505 has been interpreted to permit the bankruptcy court to determine the amount of any tax[11], including real estate tax assessments. *See In re A.W.B. Assocs., G.P.*, 144 B.R. 270 (Bankr.E.D.Pa.1992)(court applied section 505 for the purpose of challenging several years of prepetition real estate tax assessments); *In re Morelyn Plaza, L.P.*, 1997 WL 68578 (Bankr.E.D.Pa. January 23, 1997)(same); *In re Piper Aircraft Corp.*, 171 B.R. 415 (Bankr.S.D.Fla. 1994)(same). The ability of a bankruptcy court to determine any and all issues of tax liability of debtors, when there has been no prior determination by any state, judicial or judicial body, is well established in the Third Circuit. *In re A.W .B. Assocs.*, 144 B.R. at 278 (citing *In re Century Vault Co.*, 416 F.2d 1035 (3d Cir.1969); and *In re Monongahela Rye Liquors, Inc.*, 141 F.2d 864, 866–68 (3d Cir.1944)). In making such determination, section 505 grants a bankruptcy court broad discretionary powers to determine tax liabilities. *In re Penking Trust*, 196 B.R. 389 (Bankr.E.D.Tenn.1996).

A debtor's failure to meet state procedural requirements (such as payment of tax obligation) or the lapse of time between a tax year and the time of the filing does not limit the applicability of 11 U.S.C. § 505. *In re A.W.B.Assocs.*, 144 B.R. at 278. In that case, the court held that a debtor's failure to comply with state law procedures does not preclude the bankruptcy court from determining the amount and legality of a property tax for up to seven years prior to the filing of the debtor's bankruptcy petition. *Id.* The court in *Morelyn Plaza, L.P.*, 1997 WL 68578 at *3, reasoned that state law procedural requirements are preempted by the bankruptcy code. *Id.; see also In re A.W.B. Assocs.*, *supra*, (state law procedural requirements preempted by § 505(a)).

In permitting assessments of real estate taxes where state law procedural requirements are not met, the bankruptcy code through section 505, seeks to protect creditors from dissipation of an estate's assets. *In re Piper Aircraft Corp.*, 171 B.R. at 418. Such dissipation could result if creditors are bound by a tax judgment which a debtor, due to its ailing conditions, failed to contest. *Id.* Thus, as a result of section 505, a bankruptcy filing may revive the debtor's ability to contest a tax where it would not otherwise be permitted to do so under applicable state law.

Once beyond the state's *procedural* requirements, the bankruptcy court must give full faith and credit to the *substantive* law of the state to answer the ultimate question of whether the taxes are legally due and owing. *In re Morelyn Plaza, L.P.*, 1997 WL 68578 at *3 ("[t]he valuation of property for the purpose of determining property taxes must be consistent with [substantive] state law principles, as the valuation is merely part and parcel of the adjudication of the tax due and owing, a question controlled by state law." *Id.*).

In the instant case, CDS initially sought review of tax years 1991 through 1996. (Pretrial Memorandum of CDS at 5). In its pretrial memorandum, the City objected to bankruptcy court review of tax year 1991, contending that CDS had contested the assessment for tax year 1991 before the New Jersey Tax Court, and judgment was entered in that case. The City concluded that CDS's action is barred by 11 U.S.C. § 505(a)(2)(A). In response to this contention, CDS amended its pleadings to remove tax year 1991 from the appeal, seeking instead, review of tax years 1992 through 1996 only. (Amended Pretrial Memorandum of CDS at 5). In light of the fact that CDS stipulated to tax year 1991 being excluded from this appeal, it is bound by that stipulation, and judicially estopped from now asserting otherwise.

---

11. *See, e.g., H & H Beverage Distributors v. Department of Revenue*, 850 F.2d 165 (3d Cir.), *cert. denied*, 488 U.S. 994, 109 S.Ct. 560, 102 L.Ed.2d 586 (1988); *Matter of Ribs–R–Us, Inc.*, 828 F.2d 199 (3d Cir.1987); *Quattrone Accountants, Inc. v. Internal Revenue Service*, 895 F.2d 921 (3d Cir. 1990), for general authority of bankruptcy court to determine amount or legality of a tax.

In the May 28th Hearing before this court, counsel for the City made a motion to exclude from consideration by this court, tax years 1992, 1993 and 1994. (Tr. at 5). The City argued that tax years 1992 and 1993 were too "remote [to] impact financially upon the debtor." Tr. at 6. Furthermore, the City argued, if the court were to rule in favor of the CDS, there would be unfair financial consequences to the taxpayers of Perth Amboy. *Id.* As a preliminary matter, this court does not find that those tax years are too "remote." Furthermore, "remoteness" of the tax years does not prevent a bankruptcy court from exercising its discretion to reviewing tax years under section 505. As CDS correctly argues, failure to meet the *procedural* state law requirements does not prevent the bankruptcy court from determining the amount and legality of taxes under section 505. *See infra* p. 149. Additionally, as discussed above, the lapse of time between a tax year and the time of the filing for appeal of that tax year does not preclude the bankruptcy court from determining the amount and legality of a property tax for up to seven years prior to the filing of the debtor's bankruptcy petition. *In re A.W.B. Assocs.*, 144 B.R. at 278.

The City also argues there is a presumption of correctness of municipal tax assessments to which this court should give deference by refusing to hear this tax appeal. It is instructive, however, that the City does not argue that once the presumption of correctness of municipal tax assessments is overcome, the substantive law of New Jersey would preclude this court from review of tax years 1992 and 1993.

To the contrary, this court finds that under New Jersey law, a presumption does not mean that the tax assessment cannot be modified by a court. Rather a taxpayer can rebut the presumption by providing evidence which demonstrates a different valuation than that asserted by the municipality. *Schimpf v. Little Egg Harbor Township*, 14 N.J.Tax 338, 343 (1994). The " 'so-called' presumption ha[s] no artificial probative force once substantial evidence to the contrary has been asserted." *Ford Motor Co. v. Township of Edison*, 127 N.J. 290, 312, 604

A.2d 580 (1992). "[O]nce the 'presumption' is met it was the *duty* of the [tax court] to appraise the testimony and make findings of fact." *Id.* (emphasis added). The court finds that such a blind application of the "presumption" as suggested by the City, not only runs afoul of New Jersey state law, but also eviscerates the effectiveness and necessity of 11 U.S.C. § 505(a), which authorizes the bankruptcy court to review municipal assessments. Moreover, as indicated *infra* pp. 151–152, CDS has effectively rebutted the presumption. It would be a proper exercise of this court's discretion, therefore, to review the municipal assessments of tax for those years. Accordingly, this court holds that tax years 1992 and 1993 may be reviewed in accordance with section 505.

CDS's appeal of tax year 1994 presents some difficulties. CDS filed a complaint before the New Jersey Tax Court to appeal the $113,529.74 City tax assessment of the Property for that year. On May 23, 1995, however, CDS voluntarily dismissed its complaint, and thereafter paid the full amount of the assessment. As noted above, the bankruptcy court may not fix "the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction" before the commencement of the bankruptcy by the debtor. 11 U.S.C. § 505(a)(2)(A). The key issue then, is whether the filing of complaint followed by a voluntary dismissal constitutes an "adjudication" for the purposes of section 505(a)(2)(A), thus removing tax year 1994 from appeal before this court. The New Jersey Tax Court has held that a voluntary withdrawal of a municipal tax appeal by a taxpayer does not act as an adjudication by the Tax Court. *Curtiss Wright Corp. v. Wood–Ridge Borough*, 4 N.J.Tax 68, 79 (N.J.Tax 1982).

In interpreting section 505, several bankruptcy courts have also held that actual litigation before some judicial tribunal is necessary to preclude a bankruptcy court review of a municipal tax assessment. *See In re Buchert*, 69 B.R. 816 (Bankr.N.D.Ill.1987), *aff'd.*, 1987 WL 16019 (N.D.Ill. Aug. 19, 1987); *In re Tapp*, 16 B.R. 315

(Bankr.D.Alaska 1981). Guided by the New Jersey Tax Court, and interpretations of section 505 advanced by several bankruptcy courts, this court holds that the filing of the 1994 tax complaint by CDS, followed by CDS's voluntary dismissal of that complaint before adjudication by the tax, does not constitute an adjudication for the purposes of section 505(a)(2)(A).

Tax obligations assessed by the City for tax year 1995 equal $89,978.54, of which CDS has paid $30,197.88. For tax years 1996 and 1997, the tax assessed by the City remains unpaid by CDS. Furthermore, tax years 1995, 1996, and 1997 were never the subject of a prior adjudication before a tribunal. Given that those tax years were never the subject of an appeal before a judicial tribunal, this court holds that they are clearly subject to review under section 505. Moreover, as discussed above, *see infra* pp. 20–21, the payment of the tax does not preclude review under 11 U.S.C. § 505(a)(1).

For the foregoing reasons, this court concludes that tax years 1992, 1993, 1994, 1995, 1996 and 1997 are the proper focus of the instant tax appeal.

## II. Methodology of Valuation of the Property

When a bankruptcy court is called upon to apply 11 U.S.C. § 505(a) to determine the propriety of a state tax assessment of real property, it must apply the substantive state law principles, and must give full faith and credit to the law of the state upon which the tax is based. *See In re Morelyn Plaza, L.P.*, 1997 WL 68578, *3 (Bankr.E.D.Pa. January 23, 1997)(citing *Arkansas Corp. Commission v. Thompson*, 313 U.S. 132, 142, 61 S.Ct. 888, 891, 85 L.Ed. 1244 (1941)("manifestly, whether or not taxes are 'legally due and owing' to state depends upon the valid laws of the state." *Id.*) and *In re Fairchild Aircraft Corp.*, 124 B.R. 488, 492 (Bankr.W.D.Tex.1991)(same)). Property valuation for the purpose of assessing property taxes owed to a municipality is "part and parcel of the adjudication of state tax due and owing." *Morelyn Plaza*, 1997 WL 68578 at 3. Therefore, such valuation is controlled by (and must be consistent with) the princi-

ples of the substantive law of the state where the property is situated. *Id.*

The substantive law of New Jersey controls the valuation of the CDS Property. At the outset, the standard for valuation of real property in New Jersey is set forth in the New Jersey State Constitution which states that all real property dedicated to municipal purposes must be "assessed according to the same standard of value." N.J. Const. of 1947 art. VIII, sec. 1, para.1. Guided by the standard of assessment in the New Jersey Constitution, the New Jersey State Legislature has enacted legislation requiring a "true value" standard of value to be applied for the purposes of assessing property for "taxation for local use." N.J. Stat. Ann. 54:4–2.25. Furthermore, under New Jersey law, a municipal tax assessment is clothed with a presumption of correctness. *Schimpf v. Little Egg Harbor Township*, 14 N.J.Tax 338 (1994). The taxpayer can rebut this presumption of correctness with evidence that is "sufficiently 'definite, positive and certain in quality and quantity' to prove a valuation different" from the municipality's assessment. *Id.* at 343.

Under the laws of New Jersey, once the presumption of validity of the municipal tax appeal has been overcome by the taxpayer, "the focus then shift[s] to a consideration of the case on the merits and a proper valuation [i.e., 'true value'] of the property." *Schimpf*, 14 N.J.Tax at 343. Though "true value" is not defined by the legislature, New Jersey courts have consistently approached the determination of true value using one of the three traditionally accepted methods of real estate valuation, namely the sales approach, income approach or cost approach. *Inmar Assocs., Inc. v. Borough of Carlstadt*, 112 N.J. 593, 606–07, 549 A.2d 38 (1988).

The New Jersey Supreme Court recognized in *Inmar*, that an environmentally contaminated property presents special problems in applying the three traditional approaches because of the absence of adequate market data. *Id.* In *Inmar*, a case factually similar to the instant case, the court dealt with appeals of municipal tax assessments brought by two taxpayers, each own-

ing an environmentally contaminated property. *Id.* at 595, 549 A.2d 38. Specifically, the court considered the proper method for determining the assessed value of the properties when those properties were subject (as here) to governmentally-imposed requirements for environmental clean up. *Id .* The court noted that "the three classic approaches to value used in the appraisal of real estate ... all have severe limitations" when applied to environmentally contaminated properties. *Id.* at 607, 549 A.2d 38. Nonetheless, the court affirmed the "unique capability and responsibility of the Tax Court to exercise its power, in circumstances where the presumption of validity of the local assessment does not apply, to use the information available to it to make an independent determination of value." *Id.* at 609, 549 A.2d 38 (citing *Transcontinental Gas Pipe Line Corp. v. Bernards Township*, 111 N.J. 507, 538–40, 545 A.2d 746 (1988)). Thus, under New Jersey law, the determination of "true value" of the contaminated property is left to the discretion of the Tax Court. Where courts do employ a traditional method of valuation, the Supreme Court noted that such courts "tend to relax the rules of evidence and comparability in evaluation these properties." *Id.* at 606, 549 A.2d 38.

In the instant case, the City contends that its assessment of valuation for the tax years at issue must stand in that CDS has not met its burden of rebutting the presumption of validity accorded to municipal real property tax assessments. The City contends that the reliance of CDS's expert appraiser on the Killam report for the existence of environmental contamination is a "violation of a fundamental rule of evidence" in that the City had no opportunity to cross examine the expert who wrote the Killam report. This argument lacks merit. A bankruptcy court may take judicial notice under Fed.R.Evid. 201 of facts adduced in related judicial proceedings. *Florida Board of Trustees of Internal Improvement Trust Fund v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir.1975)("It is not error ... for a court to take judicial notice of related proceedings and records in cases before that court ."). As set forth *supra*, the Killam report was relied upon by Judge Gar-

rett Brown in *Custom Distribution Services, Inc. v. NL Industries, Inc.*, Mem. Op., No. 96–1237 (D.N.J. January 7, 1997), a prior proceeding involving this debtor, for the proposition that environmental contamination existed on the property. Further, given the extensive discussion by Judge Brown of both the United States Environmental Protection Agency action letters and the New Jersey Department of Environmental Protection attempts at intervention, it can hardly be argued that environmental contamination did not exist on the property, or that if it did exist, the City was unaware of this fact. Therefore, this court holds that the Killam report provides sufficient credible evidence of a variance in value of the Property between the value of the Property as assessed by the City, and the "true value" of the Property. In fact, the City's own witness conceded during the trial that his appraisal would have to be reduced to account for the costs of remediation. (*Testimony of Michael Hiller, May 28th Hearing*, Tr. at 101). Moreover, the City's counterclaim seeks to increase the assessment, thereby casting doubt on the validity of its original valuation. As such, CDS has met its burden of overcoming the presumption of validity of the municipality's assessment, and the court may proceed to a consideration of the proper valuation of the property. *Schimpf*, 14 N.J.Tax at 343.

In considering the proper approach to valuation of the property this court has considered all the pertinent facts relating to the nature and current use of the CDS property. On the issue of proper valuation models, the expert appraisal reports for CDS and the City are in agreement that employing a cost approach to the valuation would not yield reliable results. Further, both experts agree that using a pure sales approach would not provide the most accurate assessment of the "true value" of the property either, due to the lack of any real sales comparables. Both CDS and the City suggest, however, that given the current use and nature of the property, the income capitalization approach would yield the most reliable results for the valuation of the property.

A tax court in New Jersey is given broad discretion in the choice of valuation methods. *Inmar*, 112 N.J. at 609, 549 A.2d 38. Applying New Jersey Law, this court agrees with the parties that the income capitalization valuation approach would yield the most accurate assessment of "true value" for the Property. In doing so, this court rejects so much of the valuation approach of the CDS expert appraiser as is inconsistent with the methodology employed under the income capitalization approach. While CDS correctly points out in its memorandum of law that *Inmar* encourages the "ingenuity by appraisers" in employing methods of valuation of environmentally contaminated property, the court noted that such creative appraisal techniques were proper where the land was not currently "in use," 112 N.J. at 607, 549 A.2d 38. Where, as in the instant case, the property was currently being used by the owner, *Inmar* held that "normal assessment techniques will remain an appropriate tool in the appraisal process." *Id. See also Badische Corp. (BASF) v. Town of Kearny*, 288 N.J.Super. 171, 182, 672 A.2d 186 (App.Div.1996)(traditional valuation methods should be used when the environmentally contaminated property is in use). Since CDS continues to use the property, under *Inmar*, the property shall be valued according to conventional assessment techniques. Accordingly, this court rejects the "hybrid method" suggested by CDS. The creative "hybrid" valuation methodology of the CDS expert appraiser is, at first blush, attractive. This court is unaware of any case law or literature, however, where this approach has been employed where the property is capable of being valued with one of the traditionally accepted, time-tested valuation methods.

## A. Application of the Income Capitalization Approach

As discussed above, the application of the income capitalization method involves analyzing the property's capacity to generate future monetary benefits and to convert those future monetary benefits into an indication of their present value, which ultimately results in a computation of the gross capitalized income of the property. *In re 865 Centennial Avenue Associates*, 200 B.R. at 815. The first step in the calculation of gross income capitalized is to estimate the future net rental income of the property. In the instant case, this court finds that the figures for stabilized net rental income employed by CDS, where comparable leases and relevant adjustments are taken into account, are the proper indicators of net rental income of the CDS property.[12] The figure employed by CDS's expert for stabilized net rental income is $200,963.00.[13]

Once a stabilized net rental income is calculated, a capitalization rate must be selected to discount the net rental income to its present value. The court notes that CDS and the City employed almost identical methods in computing the capitalization rates, which re-

---

**12.** For its figures for net rental income, the City used the five-year historical rental performance of the CDS Property. This approach is inconsistent with the income capitalization methodology. The customary methodology for the income capitalization, employed by CDS, is the use of the market rental rate for expired lease terms. *See* Martha R. Williams & William L. Ventolo, Jr., Fundamentals of Real Estate Appraisal 53, 260 (6th ed.1994)(the income capitalization "recognizes that for rental property, the potential future net rental income is the main benefit to the owner. *Under this approach, the appraiser first* estimates the gross income from all the property's potential sources. Market rent is a property's rent potential or the amount for which the property should rent. This estimate may be higher or lower than the actual rent the owner receives." *Id.*)

**13.** During cross-examination at the May 28th Hearing, counsel for the City questioned CDS's expert's use of lease comparables, and stabilized rental income and expenses. Specifically, counsel for the City suggested that lease comparables selected by the CDS expert should not be considered as being truly comparable because the comparable leases were "net" leases whereas the leases on the CDS property were not "net" leases. (Tr. at 38–73). Secondly, counsel for the City suggested that several assumptions used by the CDS expert concerning adjustments to the lease comparables for certain expenses were faulty. *Id.* This court holds that the lease comparables used by the CDS expert were adequate, and that the adjustments made by the expert thereto, were proper. The court is satisfied with the answers to questions posed to the CDS expert at the May 28th Hearing concerning these assumptions and the calculation of stabilized net rental income.

sulted in rates that were quite similar.[14] The court therefore holds that CDS's capitalization rates are proper for the computation of gross income capitalized.

The final step in determining gross income capitalized involves taking the resultant stabilized net rental income and for each year, discounting that income figure using the predetermined capitalization rate. (*Id.; See also* Hedden App. at 15, 59; Hiller App. at 19). Applying the procedures above, the gross income capitalized for the CDS Property for tax years 1992 through 1996 is as follows:

| Tax Year | Net Rental Income | Capitalization Rate | Gross Income Capitalized |
|----------|-------------------|---------------------|--------------------------|
| 1992 | $200,963 | 13.59% | $1,478,760 |
| 1993 | $200,963 | 13.60% | $1,477,670 |
| 1994 | $200,963 | 14.24% | $1,411,260 |
| 1995 | $200,963 | 14.37% | $1,398,490 |
| 1996 | $200,963 | 14.15% | $1,420,230 |

*B. Adjustment to Value of the Property for Environmental Contamination and Remediation*

In order that the Property be valued at "true value," some adjustment must be made to the computed gross income capitalized to reflect environmental contamination on the CDS Property. Under New Jersey law, the valuation methodology employed to resolve the question of costs of environmental cleanup is not simply to deduct the cost of cleanup from a putative value of the property. *Inmar*, 112 N.J. at 605, 549 A.2d 38. In *Inmar*, the court explained that the Environmental Cleanup Responsibility Act ("ECRA")(now designated the Industrial Site Recovery Act ("ISRA") N.J.S.A. 13:1K–6 to – 14) places an ongoing obligation upon the owner of a property to ensure that the property is free from environmental contamination, and a failure on the part of the property owner to satisfy its obligations should be no cause for a reduction in the true value of the property. ISRA requires that owners certify to clean up the a contaminated industrial site during the closure, sale or other transfer of that site. N.J.S.A § 13:1K–6 to –14. The court stated further that an owner of contaminated property "can either pay now [for the cleanup] or pay later, but its management

practices do not dictate what the true value of the property will be ."[15] *Inmar*, 112 N.J. at 607, 549 A.2d 38.

As articulated by the Appellate Division in *Badische Corp. (BASF) v. Town of Kearny*, 288 N.J.Super. 171, 183, 672 A.2d 186 (App. Div.1996), "adjustments to value do not reflect the price a prospective purchaser would pay for contaminated property because environmental regulations do not permit sale of environmentally damaged land.... The seller cannot avoid the cost of cleanup, but cost is not invariably equated with value." *Id.*

This is not to say, however, that when the income capitalization approach to the value of property is employed by a New Jersey Tax Court, the consequences of environmental contamination are to be ignored in the calculus of the property value. In *Inmar*, the court stated that an environmentally contaminated industrial property valued under the income capitalization approach can be seen as having an income stream encumbered by such contamination. *Id.* The annual expenditures for environmental cleanup, though not directly reducing the value of the property, do, however, reduce the *income* produced by the property. The court in *Inmar* sug-

14. In 1992, the CDS rate was 13.59%, the City rate, 13.31%. In 1993, the CDS rate was 13.60%, while the City's rate was 13.33%. Similarly, in 1994, the CDA rate was 14.24%, the City rate was 13.97%. In 1995, the CDS rate was 14.37%, while the City rate was 14 .10%; and in 1996, the CDS rate was 14.15%, and the City rate was 13.86%.

15. The *Inmar* court provided an insightful example: if an owner borrowed funds to cleanup the environmental contamination on the property before the assessment date, and did, in fact, clean up the property, that debt incurred by the owner for the cleanup would not reduce the value of the property for assessment purposes. 112 N.J. at 603, 549 A.2d 38.

gested that a useful approach would be to deduct an annual expense for cleanup over the number of years that the parties anticipate the remediation will require. The court stated: "today's investment in the cost of neglected cure might prudently be spread out ... over a number of years. Certainly this would be more realistic than the suggestion [that] the full cost of cure be deducted annually from value." *Id.* at 608, 549 A.2d 38.

■ The parties have stipulated that a ten year time-frame is reasonably appropriate to effectuate an environmental remediation of the Property. (*See* Hedden App.; Tr.

at 100–01). This court agrees that a ten-year time-frame is proper for the purposes of spreading the costs of cure of the property. In keeping with the reasoning of *Inmar,* this court holds the figure computed for gross income capitalized above will be adjusted on a straight-line, annual basis over a ten-year period in an amount equal to the total cost of remediation of the property, which was fixed by the Environmental Protection Agency at approximately $1,390,000.00 and stipulated by the parties. Thus, the annual deduction from gross income capitalized will be $139,-000.00. For each of the tax years, 1992 through 1996, the adjustments will be as follows:

| | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|
| Gross Income Capitalized | $1,478,760 | $1,477,670 | $1,411,260 | $1,398,490 | $1,420,230 |
| Less: Environmental Adjustment | ($139,000) | ($139,000) | ($139,000) | ($139,000) | ($139,000) |
| **Adjusted Gross Income Capitalized** | **$1,339,760** | **$1,338,670** | **$1,272,260** | **$1,259,490** | **1,281,230** |

## C. Adjustment to Value of the Property for "Stigma"

■ The City objects to the 20% adjustment in value to the Property made in CDS's appraisal for the effects of the stigma of environmental contamination.

The ephemeral concept of stigma resulting from environmental contamination represents "a variety of intangible factors from possible public liability and fear of additional health hazards to the simple fear of the unknown." (Peter J. Patchin, *Contaminated Properties-Stigma Revisited,* The Appraisal Journal, 167 (Apr.1991) (hereinafter "Patchin")). In attempting to define environmental stigma, one commentator has suggested that it may be viewed as an amalgam of the following factors: (1) the level of "disruption" of activity on a property caused by an environmental problem; (2) the "visibility" of the contamination; (3) the aesthetic effect of the contamination; (4) the degree of responsibility of the current owner in creating the environmental problem; (5) the severity and duration of the contamination; (6) the degree of potential harm to which humans and wildlife are potentially exposed; and (7) the level of fear that the environmental contaminants

generates. Bill Mundy, *Stigma and Value,* The Appraisal Journal, 10 (Jan.1992)(hereinafter "Mundy").

While it is theoretically possible to construct a definition of environmental stigma, quantifying the effects of environmental stigma is indeed a daunting task. The impact of environmental stigma on the value of an environmentally contaminated property is not susceptible to direct quantification, and therefore, indirect measures of stigma must be used. In his article on stigma and property value, Mundy has suggested that when employing the income capitalization approach to the valuation of such property, the effects of stigma might be captured in the variables used in the calculation. *Id.* at 12. Those variables influenced by stigma include *rental income* (expected to be lower than for unstigmatized property), *occupancy* (expected to be less than in comparable unstigmatized property), *expenses* (expected to be higher as a result of contamination clean-up costs and post-remediation monitoring) and *capitalization rate* (expected to be increased due to perceived risk factors).

A few state courts, including the New Jersey Supreme Court,[16] have at least recog-

---

**16.** The New Jersey Supreme Court is considered to be a pioneer in the area of stigma; and the

nized the potential for the impact of stigma on the valuation of environmentally contaminated property. *See Inmar,* 112 N.J. 593, 549 A.2d 38; *Westling v. County of Mille Lacs,* 512 N.W.2d 863 (Minn.1994), *on remand to,* 1994 WL 232394 (Minn.Tax May 27, 1994), *aff'd,* 531 N.W.2d 848 (Minn.1995); *Olathe v. Stott,* 253 Kan. 687, 861 P.2d 1287 (1993)(discussing the impact of environmental stigma on valuation of contaminated land in the context of eminent domain). The New Jersey Supreme Court in *Inmar* has suggested that, in certain instances, a tax court might make adjustments in the capitalization rate used in applying the income capitalization approach to the valuation of contaminated properties for the effects of environmental stigma.[17] 112 N.J. at 609, 549 A.2d 38. *Inmar* did not foreclose the use of alternative methods of adjustment for the purposes of stigma, but instead left the means employed to implement such adjustments to the sound discretion of the tax court: "We are frank to recognize the difficulty of evaluating such market data [including data relating to stigma], but we have recently reaffirmed the unique capability and responsibility of the Tax Court to exercise its power, in circumstances where the presumption of validity of the local assessment does not apply, to use the information available to make an independent determination of value." *Id.* (quoting *Transcontinental Pipe Line,* 111 N.J. at 538–40, 545 A.2d 746).

CDS contends that at the end of the ten-year projected remediation period, it is entitled to take a twenty percent deduction from the value of the Property to account for effects of environmental stigma continuing after a remediation has taken place. (CDS Appraisal at 81; CDS Brief at 19–23). The City argues that this court should not make the stigma reduction suggested by CDS because CDS has not supported its claims that the Property will suffer a diminution in value from environmental stigma with adequate proof. (City's Letter Brief at 3).

This court finds that the property is contaminated with such metals as lead, arsenic and mercury and volatile hazardous organic compounds throughout the soil and down into the groundwater. In addition, the property is identified by the EPA as a "Superfund Site" under CERCLA and is on the Comprehensive Site List with the NJDEP under ISRA. Based upon the above, the court cannot agree with the City that no future buyer would be hesitant to acquire this property and that no stigma attaches. Indeed, to the contrary, a Superfund Site has been described in the scholarly literature as a classic example of a property to which stigma attaches. *See Toxic Blackacre: Appraisal Techniques & Current Trends in Valuation,* Lorraine Lewandrowski, 5 Alb. L.J. Sci. & Tech. 55, 56 (1994).

The City did not offer any independent analysis of what stigma should be, other than to state that the concept is too ephemeral to quantify. CDS, on the other hand, conducted a market analysis by submitting comparable properties showing an average 55% reduction in value for environmentally contaminated sites. The comparable properties used by CDS did not rise to the level of Superfund Site classification. Thus this court finds that the 20% reduction in value for stigma suggested by CDS is not only reasonable, but somewhat conservative. The court will permit the adjustment. For each of the tax years, 1992 through 1996, the adjustments will be as follows:

*Inmar* case has been described as the "most comprehensive judicial discussion to date of the impact of contamination on real property values." *See, e.g.,* Lorraine Lewandrowski, *Toxic Blackacre: Appraisal Techniques & Current Trends in Valuation,* 5 Alb. L.J. Sci. & Tech. 55, 83–84 (1994).

**17.** The New Jersey Supreme Court appears to favor an approach that accounts for the stigma of environmental contamination via an adjustment to the capitalization rate. While this methodology strikes this court as being a sound approach for capturing the effects of stigma, the failure of the parties to quantify such an adjustment to the capitalization rate during the course of these proceedings prevents this court from unilaterally adjusting the capitalization rate.

|                                    | 1992 | 1993 | 1994 | 1995 | 1996 |
|------------------------------------|------|------|------|------|------|
| Gross Income Capitalized           | $1,478,760 | $1,477,670 | $1,411,260 | $1,398,490 | $1,420,230 |
| Less: Environmental Adjustment     | ($139,000) | ($139,000) | ($139,000) | ($139,000) | ($139,000) |
| Adjusted Gross Income Capitalized  | $1,339,760 | $1,338,670 | $1,272,260 | $1,259,490 | $1,281,230 |
| Less 20% adjustment for Stigma     | ($267,959) | ($267,734) | ($254,452) | ($251,898) | ($256,246) |
| **FINAL VALUATION**                | **$1,071,808** | **$1,070,936** | **$1,017,808** | **$1,007,592** | **$1,024,984** |

### D. Adjustment for Excess Land Value

Both CDS and the City agree that the current use of the property as an industrial site is the appropriate legal use of the property. Both parties also agree that substantial demolition of existing structures and debris removal must be undertaken at a cost of $761,904 in order for the Property to be considered at its highest and best use. The parties contest, however, the contribution to the value of the Property as a whole of the 14.58 acres of unused land (which cannot be considered in the income capitalization approach, since that acreage derives no income).

The City's expert examined six comparable properties zoned for uses ranging from light industrial to heavy industrial uses. Based upon its comparables (and without making any adjustments for the differences, including the status of the subject property as a Superfund site, between those comparables and the CDS Property), the City contends that the 14.58 acres of excess land, if it were improved by the removal of certain structures from the land and developed, enhances the value of the Property for each tax year in question by an amount ranging from $996,000 to $1,206,000. The City offered no evidence whatsoever as to the physical layout of the 14.58 acres and what building sites were physically possible. The City also offered no evidence as to financial feasibility to show that the debris removal and development of the sites would be financed. Finally, the City offered no evidence as to what returns would be expected upon such financing, and how those returns would be generated so as to make such a project profitable.

Similarly, CDS's expert contended (without any comparable data to buttress his conclusions) that the excess land could potentially, if developed, contribute approximately $1 million to the parcel as a whole. CDS's expert noted, however, that the $1 million is attributable to an approved, constructed,

"ready-to-go" site. Moreover, CDS argued that the contribution to market value would be offset by the cost of demolition and debris removal (supported by the bid of Mazza & Sons, Inc. dated 4/2/91 and stipulated into evidence by both parties). In addition, CDS argued that the remaining $331,596 would be offset by the considerable environmental risks and contingencies associated with the land (supported by a detailed analysis of the environmental contamination and its impact upon market value). Finally, CDS asserted that the financial risks and contingencies, as well as the need for a purchaser's profit further reduce the value of the excess land to zero. (These final allegations were not supported by hard evidence).

If the excess land is severable and marketable independent of the parcel's primary use, or if the excess land contributes development potential to the parcel of land as a whole, its value should be ascertained and added to the value of the parcel of land as it is currently being used. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 212, 200–01 (10th ed.1992). Thus the court must decide whether the proposed use is within prospect or merely speculative.

Under New Jersey law, in order for excess land to contribute to the value of a parcel as a whole, the court must find that the use of that excess land, as proposed by the municipality, is the "highest and best use." *Schimpf,* 14 N.J.Tax at 344. "Highest and best use" is defined as "the reasonably probable and legal use of an improved property which is physically possible, appropriately supported, financially feasible and that which results in the highest value, i.e. most profitable." *Id.* at 343–44 (citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 212, 294 (10th ed.1992)); *See also United Jersey Bank–Peoples Trust of New Jersey v. Lincoln Park Borough,* 11 N.J.Tax 549 (1991).

In order to qualify as "highest and best use," a four prong test must be satisfied: the proposed use must be (1) legally permissible, (2) physically possible, (3) economically feasible, and (4) profitable. *Schimpf* 14 N.J.Tax at 344. Ultimately, "highest and best use valuation has as a prerequisite a probability of achievement... The projected use cannot be remote, speculative or conjectural." *Id.* In this case, clearly the remediation of the environmental contamination on the property is a prerequisite for the evaluation of the land at its highest and best use. *Id.*

In tax appeals, the burden is on the municipality to demonstrate that there is excess land as defined by law. *Id.* (citing *United Jersey Bank–Peoples v. Lincoln Park Bor.*, 11 N.J.Tax 549, 558 (1991); *Six Cherry Hill, Inc. v. Cherry Hill Township*, 7 N.J.Tax 120, 126 (N.J.Tax 1984), *aff'd*, 8 N.J.Tax 334 (App.Div.1986); *Inmar Assocs., Inc. v. Edison Township*, 2 N.J.Tax 59, 66 (N.J.Tax 1980)).

### 1. Legally Permissible

The parties do not dispute that industrial use is properly zoned and legally permissible for the subject property.

### 2. Physically Possible

In determining whether a use is physically possible, "[s]ize, shape, area and terrain effect the uses to which land may be developed." *Id.* (citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 296 (10th ed.1992)). In order to be considered for the purposes of adding value to the entire parcel, the land must be acreage that is capable of being used separately; a site that cannot be divided because of, for example, the location of existing structures, is not considered "excess land." (American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 290 (10th ed.1992)). A proper determination of highest and best use cannot be made without consideration of those physical factors. *Schimpf*, 14 N.J.Tax at 344.

In *Schimpf*, the tax court found that the municipality failed to perform such consideration as it did not submit or make reference to any survey or topographical map, nor did the expert testify that he actually walked the land. *Id.* at 344. Furthermore, "[t]here was no wetlands investigation or delineation of the property in order to ascertain the extent of land, if any, actually available for subdivision and development." *Id.* at 347. Thus the court found that the municipality's arguments amounted to "little more than speculation that the property may accommodate an additional use." *Id.*

In this case, there was no testimony as to physical possibility. The City offered no such evidence as to the physical layout of the land. From the maps submitted as part of the appraisal, the court could not, on its own, determine the configuration of the 14.58 acres. Thus the court does not know whether the land was shaped irregularly, nor whether any building could be constructed on the land, nor whether the acreage could support the proposed industrial use. The court finds that the City did not meet its burden as to physical possibility.

### 3. Economic Feasibility

Economic feasibility is an additional requirement which must be met in order for the property to meet the "highest and best use" test. In proving feasibility a municipality should provide evidence to show development is "economically feasible under the market conditions existing in the area." *Schimpf*, 14 N.J.Tax at 347. For example the municipality should prepare a feasibility study or market analysis to show the need for an additional proposed facility in the township. *Id.* In addition costs of permits and remedial work should be factored in. *Id.* at 348. Moreover, expense and cost of subdivision should be considered. *Id.*

In this case, the City offered no testimony and no evidence as to economic feasibility. In fact it made no argument at all concerning financial aspects of the proposed use of the property. While the court recognizes that it should not require a level of proof so burdensome and costly as to be unrealistic, in this instance, the City has offered nothing to prove this prong of the "highest and best use" test.

CDS on the other hand, argued that the environmental risks affecting the subject property impair the subject's ability to achieve its highest and best use. Although the environmental impairment does not interfere with the subject's ability to generate income from the existing, habitable structures, CDS asserts that it is unrealistic to assume the property can be renovated, expanded, sold or financed as impaired.

This court agrees that the proposed use of the vacant land faces serious obstacles in securing financing or achieving economic feasibility. As stated above, the remediation of the environmental contamination on the property is a prerequisite for the evaluation of the land at its highest and best use. *Schimpf,* 14 N.J.Tax at 348. *See also United Jersey Bank–Peoples Trust of New Jersey v. Lincoln Park,* 11 N.J.Tax 549 (1991)(In determining whether a property met the "highest and best use" test, the court indicated, that the "[r]ealization of any additional development potential therefore depends upon regulatory approval that cannot be assumed.")(citing *Six Cherry Hill, Inc. v. Cherry Hill Tp.,* 7 N.J.Tax 120, 129 (N.J.Tax 1984), *aff'd,* 8 N.J.Tax 334 (App.Div.1986).)[18] In this case there has been no showing that EPA or NJDEP would authorize the development of this land in light of the significant cleanup that has yet to be undertaken.

In addition, the remediation is a prerequisite for refinancing, as ISRA does not permit the transfer of an interest (i.e. a transfer of security interest, required by most financing institutions) in the property until clean-up is complete. N.J.S.A. § 13:1K–6 to 14; *see also Inmar,* 112 N.J. at 603, 549 A.2d 38. In addition, the status of the property as a Superfund Site requires cleanup before the property can be renovated, expanded, sold or financed as impaired. *Id. See also* CERCLA, 42 U.S.C. §§ 9601–75. The City has not indicated how this remediation would be financed or whether the remediation would occur.

Furthermore, the prospects for potential liability for the clean-up costs associated with the hazardous materials impacts the ability to find financing. Thus the court agrees with CDS that the existing contamination relegates a portion of the subject from what the owners once considered to be surplus developable acreage into unbuildable, useless land.

CDS also has argued that the property would not be financed easily in the current market area. The current lack of demand due to the oversupply of older industrial product and significant lack of financing has created a very unfavorable environment for development. In addition, CDS asserts, that since there is so little leasing taking place, any improvement built on the subject land, would remain vacant for an extended period, produce no revenue and only create holding/carrying costs. CDS concludes that, in essence, it is not financially feasible to develop the vacant site at present because a positive return to the land could not be obtained. *See United Jersey Bank–Peoples Trust of New Jersey v. Lincoln Park,* 11 N.J.Tax 549, 558 (1991)(highest and best use test was not met where it was "not shown that any particular use to which the property might be put would be economically profitable. No analysis has been made either of costs of development and construction or the need for and potential return from any given kind of development. Defendant's argument amounts to little more than speculation … " *Id.*).

The court agrees with CDS's assessments of the prospects for financing and finds that the City has not met its burden as to economic feasibility.

### 4. *Profitability*

Again, the City offered no proof as to whether the proposed use would be profitable. This court agrees with CDS that since developing the site is not financially feasible at this time, the maximally productive use and highest and best use of the land as vacant is to remain so. Only a speculator would have an interest in the undeveloped lands of the subject property.

---

**18.** In *United Jersey Bank–Peoples Trust,* the court found that the highest and best use test was not met because, *inter alia,* defendant had made no showing as to the likelihood of flood zone approval. 11 N.J.Tax at 558.

In sum, the court finds that the City has not satisfied the four prong test for highest and best use, as it has not met three of the four prongs showing that the proposed use is physically possible, economically feasible or profitable. In addition, based upon the above risks and contingencies, this court cannot find that the excess land is marketable independent of the parcel's primary use, and contributes development potential to the parcel of land as a whole. Its development potential at this time is merely speculative and accordingly, its value as if developed may not be added to the value of the parcel of land as it is currently being used. (*See Schimpf*, 14 N.J.Tax at 344 "Ultimately, highest and best use valuation has as a prerequisite a probability of achievement... The projected use cannot be remote, speculative or conjectural." *Id.*).

### CONCLUSION

For all of the above reasons, this court finds that debtor has rebutted the presumption as to the correctness of the City of Perth Amboy's tax assessment. The court will exercise its discretion under 11 U.S.C. § 505 to review assessments for tax years 1992 and 1993 as those years are not too remote and the debtor has rebutted the presumption of correctness. The court will review 1994 as it has not been the subject of a prior adjudication. Tax years 1995 and 1996 will similarly be reviewed by this court as they were not the subject of prior adjudication and the failure to meet state procedural law does not preclude review under 11 U.S.C. § 505(a). The court finds that the proper standard of review for tax assessments is "true value" of the property, and the methodology of valuation to determine such value is the income capitalization approach. The court also finds that the cleanup costs of the environmental contamination should be amortized over ten years, and that the property's value should be adjusted by 20% for the stigma of the status of the property as a Superfund Site. As such, the court finds that the proper valuation of the property and the assessed value is as follows:

|  | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|
| Gross Income Capitalized | $1,478,760 | $1,477,670 | $1,411,260 | $1,398,490 | $1,420,230 |
| Less: Environmental Adjustment | ($139,000) | ($139,000) | ($139,000) | ($139,000) | ($139,000) |
| Adjusted Gross Income Capitalized | $1,339,760 | $1,338,670 | $1,272,260 | $1,259,490 | $1,281,230 |
| Less 20% adjustment for Stigma | ($267,959) | ($267,734) | ($254,452) | ($251,898) | ($256,246) |
| **FINAL VALUATION** | **$1,071,808** | **$1,070,936** | **$1,017,808** | **$1,007,592** | **$1,024,984** |

Counsel for debtor shall submit an appropriate form of order within ten (10) days.